# Exhibit 1
# Part (1 of 2)

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2                 Docket No. CV 11 3427
3    ----------------------------
     EVEREST REINSURANCE COMPANY, :
4    A/S/O FRITZ HOKEL and
     SYM REALTY,                  :
5
                  Plaintiffs,     :
6
       -against-                  :     DEPOSITION OF:
7
     COVA CONCRETE CORP., SHARON  :        ISAAC
8    ENGINEERING, P.C., ORANGE          RABINOWITZ
     COUNTY SUPERIOR CONCRETE,    :
9    INC., SIMON DUSHINSKY, THE
     RABSKY GROUP, LLC, HSD       :
10   CONSTRUCTION, LLC, THE GOLD
     DEVELOPMENT & MANAGEMENT,    :
11   LLC, OSCAR P. WALTERS and
     DEMERARA ENGINEERING, PLLC,  :
12
                  Defendants.     :
13   ----------------------------
14
15
16          TRANSCRIPT of testimony as taken by and
17   before PATRICIA A. SANDS, a Shorthand Reporter
18   and Notary Public of the States of New York and
19   New Jersey, at the offices of HAVKINS ROSENFELD
20   RITZERT & VARRIALE, LLP, 1065 Avenue of the
21   Americas, New York, New York, on Thursday,
22
23   August 9, 2012, commencing at 11:04 in the
24
25   forenoon.

Page 2

```
 1   A P P E A R A N C E S :
 2
 3   METHFESSEL & WERBEL
     450 Seventh Avenue, Suite 1400
 4   New York, New York  10123
     BY:  FREDRIC PAUL GALLIN
 5   For the Plaintiff
     212 947-1999
 6
 7   WHITE & MC SPEDON, PC
     875 Avenue of the Americas
 8   New York, New York 10001
     BY:  FRANCES NOREK HATCH, ESQ.
 9   For the Defendant Cova
     212 564-6633
10
11   MORGAN MELHUISH ABRUTYN
     651 West Mount Pleasant Avenue, Suite 200
12   Livingston, New Jersey 07039-1673
     BY:  ERIC L. POLISHOOK, ESQ.
13   For the Defendant Sharon Engineering
     973 994-2500
14
15   ABRAMS GARFINKEL MARGOLIS BERGSON, LLP
     237 West 35th Street, 4th Floor
16   New York, New York 10001
     BY:  BRETT L. KULLER, ESQ.
17   For the Defendant Orange County
        Superior Concrete
18   646 473-7592
19
20
21
22
23
24
25
```

Page 3

1    A P P E A R A N C E S, continued.

2

3    HAVKINS ROSENFELD RITZERT & VARRIALE, LLP

     1065 Avenue of the Americas, Suite 800

4    New York, New York 10018

     BY:  JONATHAN A. JUDD, ESQ.

5    For the Defendants Dushinsky, HSD, Gold

         and the Witness

6    212 488-1598

7

8

9

10   ALSO PRESENT:

11      Joel and Martin Falcowitz, Orange County

12      Bella Livshitz, Transperfect

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1

2                          I N D E X

3   WITNESS                          EXAMINATION

4   ISAAC RABINOWITZ

5     Mr. Gallin                        6

6     Mr. Polishook                    96

7

8                      E X H I B I T S

9   NUMBER         DESCRIPTION                    PAGE

10  RABINOWITZ

11

12  1         Gold contract                        34

13  2         Sharon contract                     118

14  3         Letter                              118

15  4         Letter                              118

16

17

18  Request for production ... 22, 46, 52, 73, 106

19

20

21

22

            (Exhibits retained by counsel.)

23

24

25

1

2

3

4        IT IS HEREBY STIPULATED AND AGREED,

5   by and between the attorneys for the respective

6   parties hereto, that this examination may be

7   sworn to before any Notary Public.

8

9        IT IS FURTHER STIPULATED AND AGREED

10  that the sealing and filing of the said

11  examination shall be waived.

12

13       IT IS FURTHER STIPULATED AND AGREED

14  that all objections to questions except as to

15  form shall be reserved for trial.

16

17

18

19

20

21

22

23

24

25

1    I S A A C   R A B I N O W I T Z,

2      11 Lynch Street

       Williamsburg, New York,

3      whose interpreter having been

       affirmed and having been affirmed,

4      was examined and testified as follows:

5

6    EXAMINATION

7    BY MR. GALLIN:

8        Q     Mr. Rabinowitz, have you ever been

9    deposed before?

10       A     No.

11       Q     Do you understand some English?

12       A     Yes.

13       Q     There is no problem using a

14   translator, but I frequently find with

15   witnesses who understand a bissle of English

16   that they start not using the translator.   I

17   know this because they start answering the

18   question before it's translated.

19       If we're going to use the translator it

20   means we have to use the translator.   Even if

21   you understand the question in English, and I

22   can see you nodding, you have to wait until

23   it's translated and you have to give your

24   answer in Hebrew.   Okay?

25       A     Yes.

Page 7

1       Q     What's your date of birth?

2       A     January 18, 1961.

3       Q     Where were you born?

4       A     In Israel.

5       Q     What's your citizenship?

6       A     Dual citizenship.

7       Q     When did you get the American

8    citizenship?

9       A     I got my citizenship five years ago,

10   but I had a Green Card before and I'm here

11   about 20 years.

12      Q     Do you go back and forth?

13      A     Yes.

14      Q     Next construction, you have to give

15   verbal responses.  We can see which way you're

16   shaking your head, but the translator is not

17   supposed to translate a shake.

18      A     Okay.

19      Q     Where do you live?

20      A     New York.

21      Q     Where?

22      A     Williamsburg.

23      Q     Do you have an address?

24      A     Eleven Lynch.

25      Q     How long have you lived there?

Page 8

1      A    Nine years.

2      Q    What's your highest level of

3 education?

4      A    What kind of education do you mean?

5      Q    Yeshiva?

6      A    Yes.

7      Q    Did you graduate?

8      A    Yes.

9      Q    What year?

10     A    I studied until I was 25 years old.

11     Q    Any education outside of the Yeshiva,

12 formal education?

13     A    I studied a lot of things.  The

14 question is where do you want to get to with

15 this story?

16     Q    Did you go to college?

17     A    No.

18     Q    Any formal English language

19 universities, colleges?

20     A    Just what I learned from the streets.

21     Q    By whom are you employed?

22     A    My own company.

23     Q    What's the name of your company?

24     A    HSD Rabsky, HSD.

25     Q    Tell me about Mr. Rabsky.

Page 9

1      A    Rabsky is connected from two names,
2   Rabinowitz and Dushinsky.
3      Q    Who is Simon Dushinsky?
4      A    It's my partner.
5      Q    What's Gold Development?
6      A    It's a person who I was employed
7   with.
8           MR. KULLER:  He was employed by Gold?
9      Q    What is the business of HSD?
10     A    Construction.
11     Q    How long has it been in business?
12     A    I don't remember.  There is a lot of
13   companies, but we worked together already for
14   18 years.
15     Q    How long have you been in
16   construction?
17     A    I was in construction in Israel.
18          MR. JUDD:  Was HSD in business for 18
19      years?  Is that the question you asked?
20          MR. GALLIN:  You can ask that
21      question.  I didn't ask that question, but
22      you can ask it.
23          MR. KULLER:  Ask when the corporation
24      was formed.
25     Q    When was HSD formed?

1      A      I don't remember.

2      Q      More than ten years?

3      A      I don't remember.  I don't know.

4      Q      Who were the principals of HSD?

5      A      Me and Dushinsky.

6      Q      Who were the principals in Gold

7  Development?

8      A      Gold family, I don't know.  I don't

9  know who they are.

10      Q      When were you in construction in

11  Israel?

12      A      I was ten years there.

13      Q      Did you have your own company?

14      A      Yes.

15      Q      Where were you located?

16      A      Jerusalem.

17      Q      What were you building?

18      A      Same thing, buildings.

19      Q      100-story skyscrapers, two-family

20  houses?  There is a difference.

21      A      Family housing.

22      Q      How big?

23      A      About three four, floors.

24      Q      How did you get training in

25  construction?

1     A    From using it.

2     Q    In Jerusalem did you do a lot of

3  masonry work?

4     A    Not many, no.

5     Q    What were you building with in

6  Jerusalem?

7     A    What's the question?

8     Q    Your typical house in Jerusalem, are

9  you building it out of wood or are you building

10  it out of masonry?

11         MR. JUDD:  Or something else.

12     Q    Or something else.

13     A    In Israel there is no wood, you don't

14  build with wood.  There is either rock or

15  cement.

16     Q    So most of the houses you were

17  building in Israel were cement; correct?

18     A    Yes.

19     Q    Was it poured concrete or was it

20  cement block, or something else or a

21  combination?  Tell me.

22         MR. JUDD:  Excuse me -- well, go

23       ahead, ask the question and then I will

24       state my objection.

25     A    In Israel all of the buildings are

1   rock and cement.  Inside we construct blocks.

2           MR. JUDD:  I just object, because you

3       are not asking which buildings in

4       particular.

5           MR. KULLER:  Could you read back the

6       answer that he gave, please.

7           MR. GALLIN:  If he's building family

8       houses in Jerusalem they are all made out

9       of block.

10          MS. HATCH:  Could we just have the

11      answer read back.

12          (The answer was read back.)

13      Q    Inside of the buildings are you

14  building the walls with cement blocks?

15      A    At the time that I was building in

16  Israel there was not a sort of wall that

17  separates the rooms.  At the time that I was

18  building in Israel, we were building blocks to

19  separate the rooms and they were using cement

20  and rock on the outside.  Maybe outside of

21  Jerusalem there is a different way, but this is

22  what I am familiar with.

23          MR. KULLER:  Could you just read that

24      back.

25          (The answer was read back.)

1     Q   As I understand your answer, room

2  dividers inside the building you're using

3  cement block?

4     A   Yes.

5     Q   Outside walls are cement or rock?

6     A   They are both.

7     Q   The cement, was it built up cement

8  block or were you pouring concrete?

9     A   Pour concrete.

10    Q   When you are pouring a concrete wall

11  does the concrete start out as being wet?

12       MR. JUDD:  Are you referring to when

13    he was in Israel?

14       MR. GALLIN:  Yes.

15       MR. JUDD:  I'm just going to object

16    to form.

17       MR. POLISHOOK:  I object to the form.

18    Q   Let me ask you a question.

19  Can you pour hard, dry concrete?

20    A   No.

21    Q   If you're pouring concrete it has to

22  start out wet?

23    A.  Right.

24    Q   And as it dries it sets?

25    A   Right.

1    Q    Dry concrete has structure, has

2  strength; correct?

3    A    Yes.

4    Q    Wet concrete doesn't have any

5  strength?

6         MR. POLISHOOK:  Object to the form.

7         MR. JUDD:  Object to the form as

8    well.

9    Q    Wet concrete is a liquid; correct?

10    A    It's a liquid, it has to be in a

11  certain form.

12    Q    In order to use wet concrete properly

13  you have to pour it into a form which keeps it

14  in place until it sets?

15         MR. JUDD:  Objection to the form, to

16    the word "properly."

17         MR. POLISHOOK:  I will object also.

18         MR. GALLIN:  Go ahead, let him answer

19    the question.

20         MR. JUDD:  Do you understand the

21    question?

22         MR. GALLIN:  It isn't translated yet.

23         MR. JUDD:  Okay, sorry.

24    A    I will explain to you how you work in

25  Israel.  I want to explain how I'm building in

1   Israel.  In Israel you put a piece of wood with

2   block on the inside and from the outside you

3   put a rock.  All right.  So the way we do it in

4   Israel, okay, we put a strengthening on the

5   inside with wood.  On the outside we put a sort

6   of a block from rock.  We have to only do it

7   two rows at a time.  After we're done, we pour

8   the concrete over the whole entire two rows.

9         Okay.  So basically it's impossible to

10   pour the concrete, you know, one time in a

11   wall.  We have to do it two rows one block at a

12   time in order for that to dry, then we do

13   another two rows the next day and another two

14   rows the next day.  That's how we build in

15   Israel.

16               MR. KULLER:  Off the record.

17               (Discussion off the record.)

18               MS. HATCH:  If the record would

19         please reflect so we're not always

20         objecting, an objection by any defendant

21         is an objection by all.

22               MR. JUDD:  That's fine.

23               MR. GALLIN:  That's fine.

24               MR. JUDD:  I just want to understand,

25         he said that he put two rows down of rock,

1          is that what he said?

2               MR. KULLER:  Like a row of rock and

3          then another row of rock and then wood on

4          one side?

5               THE INTERPRETER:  No, wood inside the

6          rock for strength inside each rock.

7          Q     When you're done building your wall

8     you have a concrete wall with a rock veneer on

9     the outside?

10         A     Right.

11         Q     To me it sounded like a cookie.  I

12    got two wafers on the outside and I got a

13    cement filling in the middle.

14         A     Yes.  And there is the wood that

15    holds everything together in the middle.  The

16    wood holds the concrete.

17         Q     So it was fair to say you had ten

18    years of experience dealing with concrete in

19    Israel before you started building in Brooklyn?

20         A     Right.

21         Q     When did you start building in

22    Brooklyn?

23         A     Immediately when I came.

24         Q     Give me a year.

25         A     When I first came here I started

1    building in upstate.

2         Q    In response to that answer I will

3    change the question.

4         When you first started doing your building

5    work you were building in upstate New York?

6         A    In upstate New York, in the United

7    States, yes.

8         Q    Orange County?

9         A    Yes.

10         Q    Kiryas Joel?  K-I-R-Y-A-S, J-O-E-L,

11    two words.

12         A    It's Monroe.  Town of Monroe.

13              MR. KULLER:  Off the record.

14         (Discussion off the record.)

15         Q    Explain for them how this cookie is

16    built.

17         A    From the outside there is rock, row

18    by row.  In the middle is concrete.  In the

19    inside we have to put something like a piece of

20    wood to hold the concrete until it dries.

21         Q    And then as you're building your

22    building, do you use that wood as a wall or do

23    you put cement block up, do you put

24    sheetrock -- what do you use?

25         A    After we finish we take the wood out

1    and we put like a very light -- like a very

2    light layer of cement, you know, it's like when

3    you take the paint out you use the same

4    material.

5              MR. KULLER:  Off the record.

6              (Discussion off the record.)

7        Q    So you started building in Kiryas

8    Joel, what years?

9        A    I don't know.

10       Q    Are you still building in Kiryas

11   Joel?

12       A    No.

13       Q    What kind of buildings were you

14   building in Kiryas Joel?

15       A    Everything was residential.

16       Q    Were you using brick?

17       A    No.

18       Q    What were you using?

19       A    The basement was cement and the rest

20   was wood, stucco.

21       Q    The basement, was that poured cement

22   or were you using cement block?

23       A    The few first feet are all cement and

24   the rest of it is blocks.

25       Q    And when you pour the cement you got

1    to use a wooden form; right?

2              MR. KULLER:  Objection.

3              MR. POLISHOOK:  Object to form.

4              MR. JUDD:  Objection.

5              THE WITNESS:  Yes, we need that.

6         Q    Do you use anything besides wood for

7    your forms when you're pouring the concrete?

8              MR. JUDD:  Where?

9              MR. GALLIN:  In Kiryas Joel.

10             MR. POLISHOOK:  I'm just going to

11        object to form.  My objection is going to

12        be it's not do you, it's did you, because

13        he's not professional --

14             MR. KULLER:  We need a -- objection

15        is fine.

16             MR. POLISHOOK:  I'm saying that for

17        the future so I don't have to do it each

18        time.

19             MR. JUDD:  That's why I asked what

20        period he was referring to.

21        Q    In the past -- did you in the past

22   when you poured concrete in Kiryas Joel, did

23   you have to use a form when you poured cement

24   or concrete?

25        A    Yes.

1    Q    And what did you use for your form?

2    A    There is, you know, forms that go for

3    the concrete.

4    Q    What are they made out of?

5    A    Wood.  They are made of wood with

6    like this protective -- I mean, it's a

7    specialized form for that.

8    Q    Are these prefabricated forms or

9    would your carpenters have to build the forms?

10    A    These forms they come ready to order,

11    they are specialized ready to order for

12    concrete.  Sometimes yes, you might need to

13    tweak like a corner or two; however, these

14    forms come ready to pour in concrete.

15         MR. JUDD:  I'm just going to object

16         to that question on the ground that it

17         implies that he always used the exact same

18         form on every job that he did at Kiryas

19         Joel.

20         MR. GALLIN:  Fine.

21    Q    At some point in time did you move

22    your operations from Kiryas Joel to Brooklyn?

23    A    At Kiryas Joel I worked like four

24    years, something like that.  And after that we

25    went to Brooklyn.

Page 21

1      Q     How long have you been building in

2  Brooklyn?

3      A     Fourteen, fifteen years.

4      Q     And has Mr. Dushinsky always been

5  your partner?

6      A     Yes.

7      Q     And have you and Mr. Dushinsky had

8  different corporations over the years?

9      A     No.

10     Q     Has it always been HSD Construction?

11     A     No.

12     Q     What's the name of the company that

13  you -- you and Mr. Dushinsky, do you have a

14  corporation?

15     A     We had all of our corporations

16  together, there were many names.

17     Q     Do you have one named corporation?

18     A     Today the main name is Rabsky.

19     (Martin Falcowitz entered the deposition,

20        representative of Orange County.)

21                      (Recess.)

22     (The question and answer were read back.)

23     Q     When was the Rabsky Group formed?

24     A     The dates I can't really give you, I

25  don't know.  I don't remember.

1    Q    Give me a decade.

2    A    I don't know.

3    Q    1980s, 1990s, the 2000s?

4    A    I don't know.

5         MR. POLISHOOK:  We're just going to

6    follow-up with a demand, we'll follow-up

7    in writing for that information.

8         (Request for production.)

9    Q    Does the Rabsky Group have corporate

10   meetings?

11   A    We are two partners, we do everything

12   together.  Twenty times a day we have meetings.

13        MR. JUDD:  I just want to say all

14   discovery requests will be taken under

15   advisement, and I ask that they all be put

16   into writing, please.

17        MR. POLISHOOK:  And obviously, a

18   request made by one party is a request

19   made by everyone.

20   A    I would like just to make one point

21   clear.  When you ask me about how, you know, we

22   built in Israel, I answered your question as to

23   how, you know, the building is occurring in

24   Israel.  I did not actually perform the

25   building myself, I would just hire a

Page 23

1    subcontractor.   And every subcontractor would

2    do as they are supposed to do and build as they

3    are supposed to build.

4         Q    You were just a developer of the

5    buildings?

6         A    Yes.

7         Q    How many buildings did you build in

8    Israel?

9         A    Around 15 to like 20, something like

10   that.

11        Q    The subcontractors that you hired

12   were they Hasid?

13        A    No.

14        Q    The buildings that you were building,

15   were they for Hasid?

16        A    Yes.   Most of my workers were Arabs.

17        Q    Did they teach you anything about how

18   to work with concrete?

19        A    No.

20        Q    Did you watch what they were doing?

21        A    Yeah, I was watching, but there was

22   an engineer that was coming to check.

23        Q    You have personal knowledge, you know

24   that when you work with wet concrete you need a

25   form?

Page 24

```
 1              MR. KULLER:  Objection.
 2              MR. JUDD:  Object to the form.
 3              MR. POLISHOOK:  Objection.
 4              MR. GALLIN:  Good.  Let him answer
 5      the question.
 6              MR. JUDD:  Do you understand that
 7      question?
 8              THE WITNESS:  I understand.  The
 9      answer is yes.
10      Q      You don't need any subcontractor to
11  tell you that?
12      A      I don't need one, no.
13      Q      Do you know why we are here?
14              MR. JUDD:  Objection.
15              THE WITNESS:  Yes.
16      Q      Why are we here?
17      A      Because there is a claim.
18      Q      Why is there a claim?
19      A      Why?  I don't understand.
20      Q      Were you building a building on North
21  First Street?
22              MR. JUDD:  Objection to the form.
23      Q      Did you have any connection
24  whatsoever with a building at 50 North First
25  Street?
```

Page 25

1     A    Yes.

2     Q    You've heard of that location?

3     A    Yes.

4     Q    It's in Williamsburg; right?

5     A    Yes.

6     Q    How far is that from where you live?

7     A    Seven, ten minutes.

8     Q    How is it that you heard of this

9 building at 50 North First Street?

10    A    What's the question?

11    Q    You said you heard of this building

12 at 50 North First Street?

13    A    I know that there is an agreement

14 between me and Gold that I am to be the

15 developer.

16    Q    Who owned the property?

17    A    Gold.

18    Q    Was there a new building going up at

19 that location in 2009?

20    A    Somebody started building the

21 building before me, and I walked in in the

22 middle.

23    Q    When did you walk in?

24    A    Somewhere in 2009.

25    Q    Have you ever heard of a building at

1    48 North First Street?

2         A    What's the question?

3         Q    You're building a building at 50

4    North First Street; right?

5         A    Yes.

6         Q    Did the building exist in a vacuum?

7              MR. JUDD:  Do you understand that?

8         A    So like I already said, I came in in

9    the middle.  There was a building already with

10   steel -- well, let's put it this way.

11        There was a building in the back -- there

12   were two buildings, a building in the back and

13   a building in the front.  The building in the

14   back was already basically built with concrete,

15   and the building -- concrete and steel -- and

16   the building in the front was mostly steel, and

17   I was supposed to finish that building.

18        Q    Now the --

19        A    I was supposed to finish both of the

20   buildings.

21        Q    Now the building in the front, as I

22   stand on First Street and look at that

23   building, was there another building to the

24   right?

25        A    Yes.  There was one building on the

1  right and one building on the left.

2      Q    At some point in time did something

3  happen to the building on the right?

4      A    Yes.

5      Q    What happened?

6          MR. POLISHOOK:  Object to form.

7          MR. GALLIN:  No, he's got to answer

8      the question.  He can object all he wants.

9          MR. POLISHOOK:  If I object, I have

10     no control over the witness answering.

11     I'm just objecting to form.  I'm not

12     asking him not to answer.

13         MR. JUDD:  Do you understand what was

14     asked?

15         MR. GALLIN:  He knows exactly what

16     was asked.

17         THE WITNESS:  The question was what

18     happened?

19     Q    What happened to the building on the

20  right?

21         MR. JUDD:  On a particular day?

22     Q    Any time, tell me.

23         MR. JUDD:  At any time after he

24     started working there?

25         MR. GALLIN:  Yes.

Page 28

1      A    I have signed a contract with the

2  cement company that they are supposed to finish

3  the cement on the two sides of the building, as

4  well as finish the elevators in that building.

5      Q    What happened to the building on the

6  right?

7      A    When they were going to pour concrete

8  on the third floor on the right side, the wall

9  collapsed from the pressure of the cement.   On

10  the third floor.

11      Q    When you are doing work at 50 North

12  First Street is something bad supposed to

13  happen to the building on the right?

14          MR. JUDD:  Objection.

15          MR. POLISHOOK:  Objection to form.

16          MR. GALLIN:  He's got to answer the

17      question.

18          MR. JUDD:  Do you understand that

19      question?

20          THE WITNESS:  Yes.

21          MR. JUDD:  Okay.

22          THE WITNESS:  If you do the right

23      job, then it's not supposed to happen.

24      Q    And if something happens to the

25  building on the right that means that the job

1    wasn't being done right?

2            MR. POLISHOOK:  Objection.

3            MR. JUDD:  Objection.

4            MR. POLISHOOK:  Objection to form.

5            MS. HATCH:  Objection.

6            THE WITNESS:  Whoever did that job

7       did not do it well, yes.

8       Q    A mistake was made; correct?

9            MR. JUDD:  Objection.

10           MR. POLISHOOK:  Objection.

11           MS. HATCH:  Objection.

12           THE WITNESS:  Yes.

13      Q    If construction work is being done on

14   the building you're building, wet concrete is

15   not supposed to punch a hole in the wall of the

16   building next door?

17           MR. POLISHOOK:  Objection.

18           MR. JUDD:  Objection to form.

19           MR. POLISHOOK:  When you say "you"

20      are you asking HSD, are you asking anyone

21      else in particular?  That's my objection.

22           MR. GALLIN:  I'm discussing the job

23      site in general.

24           MR. POLISHOOK:  Objection, compound.

25           MR. JUDD:  That's why I objected.

1          MR. GALLIN:  What's your objection?

2          MR. JUDD:  To the extent that

3     you're --

4          MR. POLISHOOK:  Mine is to the extent

5     that there are multiple defendants in this

6     action, and if you're asking him

7     particularly, I don't think he is an

8     expert and can give a view as to anyone,

9     it hasn't been broken down, but I will

10    object to form.  He can answer all of the

11    questions, I'm not telling him not to

12    answer.

13         Q    If there is a construction project

14    going on at 50 North First Street, is wet

15    concrete supposed to end up on the inside of

16    48 North First Street on the third floor?

17         A    I don't understand the question.

18         Q    At some point in time did wet

19    concrete end up inside of 48 North First

20    Street?

21         A    Yes.

22         Q    And did that wet concrete initiate at

23    50 North First Street?

24         A    What do you mean "initiated"?

25         Q    Was it being poured at 50 North First

Page 31

1    Street?

2         A    Yes.

3         Q    And we can agree that the concrete

4    being poured at 50 North First Street ended up

5    inside 48 North First Street because it broke

6    the wall?

7              MR. JUDD:  Object to the form.

8              If you can, answer.

9              THE WITNESS:  If it did enter there,

10        then yes.

11        Q    Were you there that day?

12        A    Yes.

13        Q    Did you see the hole in the wall

14   yourself?

15        A    Yes.

16        Q    So there is no question at all from

17   your own personal observation that as a result

18   of construction activities at 50 North First

19   Street a hole ended up in a wall at 48 North

20   First Street?

21             MR. JUDD:  Object to form.

22             THE WITNESS:  Yes.

23        Q    And that shouldn't have happened;

24   should it?

25             MR. JUDD:  Object to form.

Page 32

1           THE WITNESS:  If you do the correct
2       job then it shouldn't have happened.
3           Q     So based on your observations
4    somebody didn't do a correct job; did they?
5           MR. JUDD:  Objection to form.
6           MR. POLISHOOK:  Objection.
7           MS. HATCH:  Asked and answered.
8           MR. KULLER:  Objection.
9           THE WITNESS:  Right.
10          Q     Were you the general contractor at 50
11   North First Street?
12          A     I'm the developer, yes.
13          Q     I thought Gold was the developer?
14          A     Yeah, I signed with Gold that I have
15   to make it, yes.
16          MR. JUDD:  He said that Gold was the
17       owner, I believe.
18          Q     Was Gold the developer?
19          A     He was the owner.
20          Q     Who was financing the project?
21          A     The bank.
22          Q     Who had the loan, Gold or you?
23          A     Gold.
24          Q     So Gold was responsible for arranging
25   the financing for the project; correct?

1      A     Yes.

2      Q     Did any of your companies have

3  ownership interest in 50 North First?

4      A     No.

5      Q     Were you just there as the overseeing

6  contractor?

7           MR. JUDD:  Object to form.

8           THE WITNESS:  Right.

9      Q     Which one of your entities was the

10  overseeing contractor?

11           THE INTERPRETER:  I'm sorry, the

12       interpreter is asking "entity", what is

13       that?

14      Q     Which one of your corporations was

15  the overseeing contractor?

16           MR. JUDD:  Object to form.

17           Do you understand that question?

18           THE WITNESS:  We work under the name

19       of HSD and Rabsky.  We work under the name

20       HSD, and the owner of HSD is Rabsky, but

21       it's the same thing.

22           MS. HATCH:  Can I have that read

23       back, please.

24           (The answer was read back.)

25      Q     Did you have a contract with Gold?

Page 34

1      A     Yes.

2      Q     Did one of your companies sign a

3  contract with Gold?

4      A     Yes, they signed.

5      Q     Which company signed the contract?

6      A     I don't remember.

7      Q     Was it HSD, was it Rabsky or some

8  other entity?

9      A     I don't remember.

10     (Exhibit 1 marked for identification.)

11     Q     The question is can you read English?

12     A     I can confirm that the signature is

13  mine.

14          MR. POLISHOOK:  Did he answer --

15          MR. GALLIN:  He doesn't read English.

16          MR. POLISHOOK:  Is that the -- he

17     doesn't read English, can we just confirm

18     that on the record.

19     Q     You don't read English?

20     A     No.

21     Q     Do you understand that contract?

22     A     If I understand, no.

23     Q     Did you know what you were signing

24  when you signed it?

25     A     I know that my partner saw it and it

1    was good with him.

2         Q    Why did you sign it and not your

3    partner?

4         A    It's the same thing.

5         Q    Does your partner read English?

6         A    Yes.

7         Q    Was that contract signed before the

8    hole got punched in 48 North First?

9              MR. POLISHOOK:   Objection.

10             THE WITNESS:   This is what I signed

11        when we finished the deal between us.

12        Q    And was that before the concrete

13   ended up inside of 48 North First?

14        A    Yes.

15        Q    Does that contract identify which one

16   of your entities was involved in this job?

17        A    Yes.

18        Q    Which one?

19        A    HSD.

20        Q    Can you read where HSD is put down,

21   do you recognize that even though it's written

22   in English and not in Hebrew?

23        A    Yes.

24        Q    As general contractor what was your

25   company's job in connection with this job site?

1          MR. JUDD:   Object to the form.

2          THE WITNESS:   Let me rephrase the

3     question.

4      Q     What was your understanding of what

5  your company's job was in connection with this

6  construction site?

7      A     To finish contracts with all of the

8  subcontracts, everybody what they have to do.

9  To get permits from the Building Department,

10 insurance for the building.  To deal with all

11 of the --

12         MR. KULLER:   Can you just read back

13     that answer, please.  The question and

14     answer, please.

15  (The question and answer was read back.)

16     Q     When you first got involved with this

17 project the building was partially built?

18     A     I already explained before what stage

19 the building was at.

20     Q     The steel structure was already up?

21     A     Eighty-five percent of it.

22     Q     Did you have to do any steel work at

23 the project?

24     A     Yes.

25     Q     Was that before or after the concrete

1    incident?

2        A    So some of it I was supposed to do

3    before this happened, some of it I was supposed

4    to do after this happened.  And some of it we

5    started changing, because the Building

6    Department came and said that part of the steel

7    of the structure wasn't safe.

8        Q    The steel that wasn't safe, was that

9    steel you had put up or somebody else had put

10   up?

11            MR. JUDD:  Object to form.

12            THE WITNESS:  Somebody else put up.

13       Q    Who was the prior contractor, do you

14   know?

15       A    There is a name of a company, I don't

16   know how to like write it to spell it.

17       Q    Not that important.

18       Do you know why they were replaced and you

19   got the job?

20       A    No.

21       Q    Had you done work for Gold before?

22       A    No.

23       Q    Had you built buildings before where

24   you were responsible or one of your companies

25   was responsible for the financing?

Page 38

1    A    Yes.

2         MS. HATCH:  Can I have the question

3    read back.

4         (The question was read back.)

5    Q    Was it your understanding that your

6    company had any role in overseeing the work of

7    the subcontractors?

8         MR. JUDD:  Object to form.

9         THE WITNESS:  What's the question?

10   What do you mean by "responsible," for

11   what?

12   Q    Did you have any interaction with the

13   subcontractors?

14   A    To see -- I don't understand.

15   Q    Do you know what a general contractor

16   is?

17   A    I know that I have to -- I have to

18   arrange all of the subs, but the question is --

19   I mean, what's the question?

20   Q    Who made the contracts with the

21   subcontractors, Gold or you?

22   A    Me.

23   Q    Do you pay your subcontractors before

24   they do the work or after they do the work?

25   A    I usually pay them a small amount

Page 39

1    before and then as they work.

2        Q    And before a subcontractor gets paid

3    you made sure they did the work; correct?

4        A    I mean, you know, the work, it's not

5    just me that checks the work, the engineer from

6    the bank comes to check, they send like a team

7    from the bank to check that the work was done

8    and to check how it was done.  And then after

9    that we give them the money.

10       Q    Do you participate in this overseeing

11   of the subcontractor's work?

12           MR. JUDD:  Object to form.

13           THE WITNESS:  If you're asking if I

14       come to check if they are working, yes.

15       If you're asking me if I have to check how

16       they are working, if they are doing what

17       they are supposed to be doing, no.

18       Q    Does anybody from your company check

19   to see if the subcontractors are doing the job

20   right?

21       A    Sorry, what's the question?

22           MR. GALLIN:  Read it back.

23       (The pending question was read back.)

24           MR. JUDD:  Object to form.

25           You can answer.

Page 40

1          THE WITNESS:  I was there every day,
2      sometimes even a few times a day and I was
3      checking if they work, right.
4      Q     Was there a structural engineer
5  associated with this project?
6          MR. POLISHOOK:  Object to form.
7          THE WITNESS:  Yes.
8      Q     Who was it?
9      A     Usually what I like to do -- there
10  was already an engineer, a mechanical engineer
11  there that was working with the last contractor
12  that Gold hired.  I usually like to hire my own
13  engineers that I had worked with in past
14  buildings that I was building.  When that thing
15  happened with the concrete, there was two, but
16  one was still with the Building Department.
17          MR. JUDD:  What?
18          MR. GALLIN:  Okay.
19          MR. JUDD:  We'll clear it up.
20          MR. GALLIN:  All right.
21      Q     Is there an engineer you like to work
22  with?
23      A     Yes.
24      Q     Is that Sharon?
25      A     Yes.

1  Q When Gold first started this project

2 they had to submit plans to the Building

3 Department; correct?

4  A I'm sorry.

5  Q When this project starts, Gold has to

6 get a new building permit; correct?

7   MR. JUDD:  Object to form.

8   THE WITNESS:  Yes.

9  Q In order to get a new building permit

10 they had to submit plans for approval by the

11 Building Department?

12   MR. POLISHOOK:  Object to form.

13   THE WITNESS:  That's right.

14  Q And those plans had to be stamped by

15 either a registered architect or a professional

16 engineer?

17  A Yes, both.

18   MR. POLISHOOK:  Are you asking when

19  Gold took over the job -- forget it.

20  Withdrawn.

21  Q Did you ever see that set of plans?

22  A Yes.

23  Q Who stamped the plans, the original

24 plans of this building, who stamped them?

25  A I had the plans from the engineer,

1   from the architect and from the Building

2   Department.

3        Q    Let's focus on the engineer.

4        The steel work, the concrete, that has to

5   get approved by a structural engineer; correct?

6             MR. POLISHOOK:  Object to form.

7             THE WITNESS:  Yes.

8        Q    Have you ever heard the name Demerara

9   Engineering, D-E-M-E-R-A-R-A, Engineering?

10       A    Yes.

11       Q    Was Demerara the original engineer

12  who stamped the plans for the Building

13  Department?

14       A    Yes.

15       Q    Was Demerara still on the project

16  when your company took it over?

17       A    Yes.

18            MR. POLISHOOK:  Object to form.

19       Q    Did you ever meet with Oscar

20  Demerara?

21       A    No.

22       Q    Do you know who Oscar Walters is?

23       A    I only met with the architect,

24  everything else went through Gold.  Every

25  question that was asked, the answer went

Page 43

1    through Gold.

2         Q    Who was the architect?

3         A    I don't remember, but I had his

4    plans.

5         Q    Did you ever meet with Sharon at the

6    job site?

7         A    Yes.

8         Q    Was Sharon ever at the job site

9    before the concrete incident?

10             MR. POLISHOOK:  Object to form.

11             THE WITNESS:  Yes.

12             MR. JUDD:  Excuse me just one second.

13             Off the record.

14         (Discussion off the record.)

15        Q    For what purpose did you meet Sharon

16   at the job site before the concrete incident?

17             MR. POLISHOOK:  Object to form.

18             He didn't say he met him.

19             MR. JUDD:  I will rephrase the

20        question.

21             MR. KULLER:  Off the record.

22         (Discussion off the record.)

23        Q    Did you meet with Sharon at the job

24   site before the concrete incident?

25        A    Yes.

Page 44

1     Q   Why did you meet with Sharon at the

2   job site before the concrete incident?

3     A   Because I wanted to replace the

4   engineer.

5     Q   Had Sharon taken over as a

6   replacement engineer before the concrete

7   incident?

8          MR. POLISHOOK:  Object to form.

9          THE WITNESS:  You mean legally?

10     Q   Had Sharon given any advice in

11   connection with this project before the

12   concrete incident?

13          MR. POLISHOOK:  Objection to form.

14          THE WITNESS:  Yes.

15     Q   What advice had Sharon given

16   concerning this project before the concrete

17   incident?

18          MR. JUDD:  Same objection.

19          THE WITNESS:  He gave me plans of how

20       to do the concrete.

21     Q   The original plans did not call for

22   poured concrete walls; did they?

23          MR. JUDD:  Object to form.

24          You can answer.

25          THE WITNESS:  As far as I remember

Page 45

1      there were a few plans.  There was one

2      plan that was for blocks, there was one

3      plan that was an optional plan, which

4      means concrete or blocks.  And Sharon

5      wanted to do concrete.

6          Q    And Sharon wanted to do the concrete

7      before the damage was suffered next door;

8      correct?

9              MR. POLISHOOK:  Object to form.

10             You asked for a state of mind, you

11         have to ask what was actually

12         communicated.

13             MR. GALLIN:  We can argue about that

14         later.

15             MR. POLISHOOK:  Fair enough.

16             MR. JUDD:  Note my objection also,

17         please.

18             MR. GALLIN:  Let him answer the

19         question.

20             MR. JUDD:  Go ahead, if you can.

21             THE WITNESS:  What's the question?

22         Q    Did Sharon express to you that you

23     should be doing poured concrete before the

24     damage was suffered to the next door building?

25             MR. JUDD:  Object to form.

Page 46

1       THE WITNESS:  Sharon made a plan.

2    Q    He made a plan for poured concrete?

3       MR. POLISHOOK:  Objection to form.

4       THE WITNESS:  Yes.

5    Q    And that was before the damage was

6    suffered next door?

7    A    Yes.

8       MR. KULLER:  We will call for

9       production of all plans by Sharon for the

10      poured concrete.

11         (Request for production.)

12      MR. POLISHOOK:  You can make the

13      demand for him, but there aren't --

14      MR. KULLER:  Eric, you're not getting

15      summary judgment.

16      MR. POLISHOOK:  I'm just stating for

17      the record I think there is a

18      mischaracterization.

19      THE WITNESS:  Okay, so there was one

20      point about Sharon.  Sharon's plans were

21      not yet approved by the Building

22      Department.

23      MR. JUDD:  As of the date of the

24      accident?

25      THE WITNESS:  Yes.

1    Q    Were you doing work -- was work

2    taking place on the day of the accident based

3    on plans that had not yet been approved?

4         MR. JUDD:  Object to form.

5         THE WITNESS:  No.

6         MS. HATCH:  Can I have the question

7    read back, please.

8         MR. GALLIN:  I asked him whether

9    plans had been done --

10        MS. HATCH:  I'm sorry, if I could

11   just have the question read back.  Because

12   the way you phrased it --

13        MR. GALLIN:  Go ahead.

14        MS. HATCH:  The question and the

15   answer, please.

16   (The question and answer were read.)

17   Q    On the day of the accident a concrete

18   wall was being poured; correct?

19   A    Yes.

20   Q    And that was pursuant to plans

21   prepared by Sharon?

22        MR. POLISHOOK:  Objection to form.

23        THE WITNESS:  I had two plans.  There

24   was a plan from the old architect with

25   concrete as well.

Page 48

1       Q       Was that poured concrete?

2       A       Yes.

3       Q       Were there any notes on that plan for

4    poured concrete as to how the concrete pour was

5    supposed to take place?

6               MR. POLISHOOK:   Objection to form.

7               There is no foundation that he even knows

8               how to read plans.

9               MR. JUDD:  Objection.  I agree with

10              that.

11              THE WITNESS:  No architect, okay,

12              gives detail of how to pour concrete, just

13              like no cook is going to give detail of,

14              you know, where you pour the food to a pan

15              or something else.  Everybody has their

16              own -- their own thing that they are

17              specializing in.

18              The concrete guy has the concrete.

19              The architect doesn't give the detail what

20              kind of forms to use or how to use them,

21              and how to pour it, if you pour it with

22              your hands or, you know, if you pour it

23              with something else.  This is, like, all

24              of these details, no architect gives those

25              details.

Page 49

1      Q    The plans that you got from Sharon
2  were they written or oral?
3            MR. POLISHOOK:  Objection to form.
4            THE WITNESS:  It was written.
5      Q    Were they submitted to the Building
6  Department for approval?
7            MR. POLISHOOK:  Object to form.
8            What plans are you even talking
9      about?
10           MR. GALLIN:  Eric --
11           Answer the question.
12           THE WITNESS:  I don't remember when
13      those plans were given, but I do know that
14      during that date the plans were not
15      approved.
16     Q    Had they been submitted to the
17  Building Department for approval before the
18  date of the accident?
19           MR. POLISHOOK:  Objection to form.
20           THE WITNESS:  I don't remember.
21     Q    Had you gotten from Sharon before the
22  date of the accident?
23     A  .  Yes.
24     Q    How were Sharon's plans different
25  than the prior architect's plans?

1          MR. POLISHOOK:  Objection to form.

2          Rick, there is testimony he doesn't

3     even speak English -- read English.  So

4     you need to set a foundation as to any

5     basis he has to even read plans.  It's not

6     proper.

7          MR. GALLIN:  It's not proper because

8     you don't like the way the testimony is

9     going.

10          MR. POLISHOOK:  No, no.  Rick, it's

11     not -- there is no foundation.  He can

12     answer the question.

13          MS. HATCH:  Can I have the question

14     read back.

15          MR. POLISHOOK:  There is no reference

16     to what plans, there is no reference that

17     he has any way to view plans, or he also

18     testified he doesn't read English.

19          He can answer the question.  I

20     haven't stopped him from answering the

21     question.

22          MR. GALLIN:  Fine.  Your objection is

23     noted, let him answer the question.

24     Q    How were Sharon's plans different

25     than the existing plans, if you know?

Page 51

1      A    I will know it was different.  He
2  gave me details to do concrete.
3      Q    What details did Sharon give you
4  concerning the concrete?
5              MR. JUDD:  Object to form.
6              THE WITNESS:  Which rebar to use, and
7        how many inches the concrete needs to be.
8      Q    Prior to the date of the incident had
9  you poured any other concrete walls at that
10  project?
11      A    Yes.
12      Q    Where had you poured walls?
13      A    The same wall, first and second
14  floor.
15      Q    So the first and second wall was
16  poured concrete?
17      A    Yes.
18      Q    Who was pouring the concrete?
19      A    Same guy.
20      Q    Are they sitting at the table?
21      A    Yes.
22      Q    Orange County Concrete?
23      A    Yes.
24      Q    Do you know who Cova Concrete is?
25      A    I met with Joel, I spoke to Joel, and

Page 52

1    with him I closed the contract.

2         Q     Did you have a contract with Cova

3    Concrete?

4         A     Yes.

5         Q     What was your contract with Cova

6    Concrete for?

7         A     The work that has to be done.

8               MS. HATCH:  I ask for production of

9         the Cova Concrete contract.  I have not

10        seen one in this case.

11               (Request for production.)

12        Q     Is the contract with Cova Concrete

13   written or oral?

14        A     It was supposed to be written.

15        Q     Was it written?

16        A     From what I remember, yes.

17        Q     Cova Concrete, are they Hasid?

18   The guys sitting at the table, that's

19   Orange County Concrete; right?

20        A     If, you know, if it's the same name,

21   this person, Orange County, if it's the same

22   name then that's him.

23               MS. HATCH:  Can you just clarify for

24        me whether this witness is saying that HSD

25        Rabsky had a contract with Cova or he

1          thinks there was some contract with Cova.

2          Q     Did HSD have a contract with Cova, or

3    was Cova's contract through your subcontractor,

4    Orange County?

5               MS. HATCH:  Objection to form.

6               THE WITNESS:  I don't know what was

7          going on between other companies.  I had a

8          deal with this person siting right there

9          at the table, and this, whatever, if this

10         person got a contract with other

11         contractors, I have a contract with this

12         person.

13              MS. HATCH:  Can we get a confirmation

14         that he is not saying he had a contract

15         with Cova.

16         Q     Mr. Rabinowitz, your only concrete

17   contract was with the gentlemen sitting at the

18   table, Orange County Concrete?

19              MR. KULLER:  Objection.

20              THE WITNESS:  Yes.

21         Q     If they subcontract the concrete to

22   other people, this you don't know about?

23         A     No.

24         Q     If they had somebody else supplying

25   the concrete to them, this is also something

1   you don't know about?

2         A    No.

3         MS. HATCH:  No, he doesn't know, or

4   no there is no contract?

5         MR. GALLIN:  No, he doesn't know is

6   the way I understand his testimony.

7         Fran, ask the question.  Ask the

8   question the way you want it asked.  This

9   is your stage, go ahead.

10        MS. HATCH:  Sir, a bit earlier in

11  your testimony you said that you heard of

12  somebody by the name of Cova Concrete; is

13  that true?

14        THE WITNESS:  What I stated before

15  was that I had a deal with this person

16  sitting at the table, this is a person who

17  I had a deal with.  If somebody else took

18  a sub or used other companies, then I

19  don't know about it.

20        MS. HATCH:  All right.  So up until

21  the time of the accident in this case, the

22  only company you were working with respect

23  to concrete was Orange County Concrete,

24  the people here at the table; is that

25  correct?

1          MR. KULLER:  Objection.

2          THE WITNESS:  Yes, I know that when

3      there was the accident, he was there, not

4      somebody else.

5          MS. HATCH:  And I know that because

6      we have a lawsuit pending and there

7      certain names of it, and you may have

8      learned things since the accident, but I'm

9      asking for your knowledge before the

10     accident in question.

11         Before the accident in question had

12     you ever heard of a company named Cova

13     Concrete?

14         THE WITNESS:  No.

15         MS. HATCH:  Thank you.

16     Q    On how many different days were the

17 concrete walls being poured next to 48 before

18 the incident happened?

19         MR. JUDD:  Object to form.

20         I assume you're only referring to

21     that one wall.

22         MR. GALLIN:  That's the only wall I

23     care about.

24         MR. JUDD:  Okay.  The one wall that

25     was adjacent to the adjoining property?

Page 56

1        MR. GALLIN:  Yeah.

2        MR. JUDD:  Okay.

3        MR. GALLIN:  I'm trying to find out

4    was it done in one day or done in

5    different days.

6        MR. JUDD:  Okay.

7        THE WITNESS:  Which wall, the first

8    floor, second floor, third floor?

9        Q    Was the first floor, second floor and

10   third floor, were they poured on different days

11   or on the same day?

12       A    A few days.

13       Q    Had Orange County Concrete done any

14   work at that construction site other than the

15   wall next to 48?

16       A    I'm not sure.  In the contract they

17   were supposed to do the elevators as well, but

18   you know, I'm not sure what they did.  I think

19   they did.

20       Q    Were you there every time Orange

21   County was there doing work?

22       A    I wasn't standing there the whole

23   time, I come and go.

24       Q    Did you see them doing work?

25       A    Yes.

1      Q    Was the way they poured the concrete

2   the same for the first floor, for the second

3   floor as it was for the third floor?

4           MS. HATCH:  The walls for the first

5       floor, the second floor and the third

6       floor.

7           MR. KULLER:  Objection.

8           MR. JUDD:  Objection as well.

9           THE WITNESS:  I didn't check before

10      the concrete was formed, but after it was

11      formed I checked and I saw that it was

12      poured all the same way.

13          MR. KULLER:  Can you read that back,

14      the answer and the question.

15   (The question and answer were read back.)

16      Q    Was there a truck out in the street

17   delivering the concrete?

18      A    Yes.

19      Q    Who that truck belonged to you don't

20   know; right?

21      A    No.

22          MS. HATCH:  I'm only objecting to

23      form in so far as your question appears to

24      assume it was the same concrete provider

25      on each day.  And it's my understanding

1      that was not the case.

2           MR. GALLIN:  He just said he has no

3      idea.  But it doesn't matter.  He just

4      said he doesn't know who the truck

5      belonged to.

6           MS. HATCH:  But just so you know.

7           MR. GALLIN:  Thank you.

8      Q    Concrete was delivered through hoses?

9      A    There was a pump and they put that

10  pump up on every floor that was needed.

11     Q    Were they using rebars?

12     A    Yes.

13     Q    Who put the rebars up?

14     A    The guy that does the concrete.

15     Q    Was there a form for the concrete?

16     A    Yes.

17     Q    What did they use as a form for the

18  concrete?

19           MR. KULLER:  Objection.

20           MS. HATCH:  For the walls; correct?

21           MR. GALLIN:  It's wet concrete, there

22     has to be a form.

23           MS. HATCH:  Off the record.

24           (Discussion off the record.)

25     Q     Mr. Rabinowitz, do they pour the

1   floors as well as the walls?

2        A     No.

3        Q     Just the walls?

4        A     They were supposed to pour the floor

5   also, but the floor was poured in a different

6   way.

7        Q     The first floor, what was poured --

8   did they have to pour a first floor for the

9   floor?

10       A     Let me explain to you how that works.

11       Q     Okay.

12       A     When you have to pour concrete on a

13  ceiling, you have to have some kind of

14  something, some support structure.  And the

15  support structure is steel -- if you build

16  concrete, you have to do a support structure

17  that will support eight inches of concrete.

18       Q     That's for the floors?

19       A     This building was different, because

20  it was steel.  There is decking on the steel,

21  and this is the support structure for the

22  concrete.  From the concrete.  And then because

23  of that, you only pour four inches.  It's the

24  way the plan shows.

25       Q     Four-inch floor?

Case 1:11-cv-03427-CBA-JO   Document 83-1   Filed 09/28/12   Page 61 of 73 PageID #: 411

1          A     Yes.

2          Q     How many floors, horizontal floors

3    did Orange County pour before the accident?

4          A     I don't remember.

5          Q     Did they have to pour a floor for the

6    first floor?

7          A     The first floor was supposed to have

8    parking, that was the last thing.

9          Q     What was the order in which they

10   poured -- the walls was not a horizontal pour,

11   the wall was a vertical pour; correct?

12               MR. KULLER:  Objection.

13               THE WITNESS:  Yes.

14         Q     Was there any particular order as to

15   whether they did the horizontal pours or the

16   vertical pours first?

17               MR. KULLER:  Objection.

18               THE WITNESS:  If you mean if that

19         makes a difference with the building, no.

20         Q     How was it actually done here,

21   though?

22         A     I don't remember.

23         Q     At the time of this incident they

24   were doing a vertical wall on the third floor?

25               MR. KULLER:  Objection.

Page 61

1       THE WITNESS:  Yes.

2       Q      Had they already done a vertical wall

3  on the second floor?

4       MR. KULLER:  I have a standing

5       objection for every single question that

6       has to do with pouring concrete.

7       MR. GALLIN:  Great.

8       MR. KULLER:  Then I don't have to

9       object.  The reason is because you're

10      saying that -- and as far as we're

11      concerned, HSD as much as Orange County

12      was pouring concrete.  So that's the basis

13      for my objection, and then I don't have to

14      interrupt.

15      MR. GALLIN:  Fine.  Your objection is

16      noted.

17      MR. JUDD:  And of course it's our

18      position that we weren't pouring.

19      Q      Let me ask you a question.

20  Was there somebody standing there with a

21  hose directing the concrete?

22      A      What's the question?

23      Q      Concrete starts in a truck; correct?

24      A      Yes.

25      Q      How does the concrete get from the

Page 62

1    truck to inside the building?

2        A    There is a few ways that you could do

3    that.

4        Q    How was it done here?

5             MR. JUDD:  If you know.

6             MR. GALLIN:  He was there, he saw.

7        A    I don't know.

8             MR. JUDD:  Well, he wasn't there

9        every time.

10       Q    Did you ever see concrete coming out

11   of something that started in the truck and was

12   ending up in the building?

13       A    Yes.

14       Q    Tell me what you saw, over your

15   attorney's objection, who says you didn't see.

16            MR. JUDD:  No, no, I said it's

17       mischaracterization to say that he was

18       there at the time that this occurred.

19            MR. GALLIN:  I didn't --

20       Q    Tell me what you saw.

21       A    The accident?

22       Q    No.  Did you ever see Orange County

23   doing work at the job site?

24            MR. JUDD:  Every --

25       Q    From the beginning of time to today,

Page 63

1  did you ever see them doing work at the job

2  site, from the time of Adam?

3          MR. POLISHOOK:  Stop screaming.

4          MR. GALLIN:  Object.

5          THE WITNESS:  Yes.

6  Q     What did you see?

7          MR. GALLIN:  I'm tired of the

8      frivolous objection.  Every frigging

9      question there's an objection, it's

10     ridiculous.

11         MR. POLISHOOK:  I didn't object, you

12     don't need to scream at him.

13         MR. GALLIN:  I'm not screaming at the

14     witness.

15  Q     What did you see?

16  A     When he was pouring the floor, he was

17  pouring directly from the truck to the floor.

18  Q     Was there a hose, was there some sort

19  of connection between the truck and the floor?

20  A     Pump.  That's the pump.

21  Q     And the guys using the pump, were

22  they HSD guys or were they Orange County

23  Concrete guys?

24  A     The concrete guys.

25  Q     Thank you.  So your people didn't

1   physically do the concrete work; did you?

2        A    Right.

3        Q    The actual physical labor, the guys

4   using their muscles, were the Orange County

5   Concrete guys?

6        A    That was their job, yes.

7        Q    So how was the concrete getting from

8   the truck when they were doing the vertical

9   pours?

10            MR. JUDD:   Was it the same thing?

11       A    If you did the same thing.

12       Q    You have concrete in a truck;

13   correct?

14       A    Yes.

15       Q    You have concrete in the truck, and

16   the truck is in the street; correct?

17       A    Right.

18       Q    And somehow the concrete has to get

19   up to the third floor level; correct?

20       A    Yes.

21            MS. HATCH:   Can we go off the record

22       for a second?

23            MR. GALLIN:   What?

24            (Discussion off the record.)

25       Q    We just had an off-the-record

1   conversation which may have been helpful in

2   directing this.

3         Was there more than one truck involved in

4   the concrete?

5         A     The question is how much concrete is

6   needed.  Sometimes there was one, there was

7   two, there was three, sometimes even twenty.

8         Q     Was there one of those big concrete

9   mixing trucks mixing the concrete?

10        A     She explained before very well, there

11  is a truck that brings the concrete and then

12  there is a pump that takes the concrete and

13  brings it to whatever place that it's needed.

14        Q     The reason why you had to say it is

15  because you're the witness and she can't

16  testify.

17        So I'm going to ask you a question, if you

18  can explain what she said as you as a witness,

19  that would be helpful.

20        Can you explain how the concrete pump

21  worked?

22        A     So the truck, the concrete truck

23  pours it into a trough, which is like a pump,

24  and then by air pressure that pump brings it to

25  whatever floor is needed.

1      Q   Did they need the pumping truck for

2  the first floor pour?

3      A   For the floor pour; right?

4      Q   For the first floor.

5      A   No.

6      Q   For the second or the third floor

7  they needed a pumping truck?

8      A   Yes.

9      MR. JUDD:  When you say the second or

10     third floor, are you talking about the

11     wall or are you talking about the floor

12     itself?

13      MR. GALLIN:  Either one.

14      MR. JUDD:  Well, is it the same

15     answer?

16      THE WITNESS:  Yes.

17      Q   Now with the air pump is there some

18  sort of hose that the concrete goes through to

19  get to the second or third floor?

20      A   It gets to the pipe, and then from

21  that it goes to the pump and from there it goes

22  to the floor.

23      Q   From the pumping truck to inside the

24  building is there some sort of pipe or some

25  sort of hose?

1      A     Yeah, there is a hose.

2            MR. GALLIN:  Let's take a break now,

3      it's one o'clock.

4            (Lunch recess, 1:02 to 1:54.)

5  BY MR. GALLIN:

6      Q     Now you had previously said that you

7  had a set of plans which gave the option

8  between a concrete wall and poured concrete.

9      A     Yes.

10     Q     Do you know where those plans are?

11     A     No.

12     Q     Who gave you those plans?

13     A     Gold.

14     Q     Did you discuss with Gold or anyone

15 else which option to pick?

16     A     No.

17     Q     Who made the -- we're talking about

18 the plans for the walls, vertical walls between

19 50 and 48.  Okay?

20     A     Yes.

21     Q     Who made the decision as to go with

22 poured concrete instead of cement block?

23           MR. POLISHOOK:  Object to form.

24           MR. JUDD:  Me, too.

25           MR. GALLIN:  I would object, too, but

Page 68

1    I asked the question.

2    Q    Who made the decision?

3    A    I did.

4    Q    When did you make the decision?

5    A    Before the start of the work.

6    MR. KULLER:  Before who started the

7    work?

8    THE WITNESS:  The concrete guy.

9    Q    What factors, what went into the

10    decision, your decision to use the poured

11    concrete?

12    MR. POLISHOOK:  Object to form.

13    THE WITNESS:  So what happened was

14    there was a -- I made a decision to do the

15    concrete.  What happened was there was --

16    from before there was a steel structure

17    and there was concrete already poured

18    previously, but I saw that that wall is

19    not strong enough if the wind hits the

20    building.

21    So I had three ways to fix the

22    situation.  I could either build some more

23    steel to make the structure stronger, I

24    could either use the block, but the block

25    method did not seem like the right method,

1    because then I would have to pour the

2    concrete into little holes.  And I had a

3    concrete method.

4         So, to me, the concrete method seems

5    the best method and the strongest method

6    and the easiest method to execute.

7         Q    When you said pouring concrete into

8    little holes, did you mean pouring concrete

9    into the holes in the cinderblocks?

10        A    Yes.  You had to use the blocks and

11   use the rebar, and then fill the blocks full.

12        Q    You said the wall being hit by the

13   wind.  Which wall were you referring to?

14        A    The wall on the sides, which was

15   supposed to be concrete.

16        Q    Would wind hit the wall between 50

17   North and 48 North?

18        A    You know, the point is not the wall

19   against the wind, the point is when you build a

20   building you have to make sure that the whole

21   entire building is strong enough to withstand a

22   certain amount of wind.  It's not just a wall,

23   it's the whole building has to be strong enough

24   to withstand a certain amount of wind.

25        Q    Along First Street, the front of the

1    building, you had to build a wall there, too?

2         A    That there is built heavy gauge

3    metal.

4         Q    What was the front wall of the

5    building made out of?

6         A    Heavy gauge metal frame.

7         Q    And what would fill in the frame?

8         A    Insulation and sheetrock.

9         Q    So the actual exterior wall of the

10   building was metal?

11        A    On that they were supposed to put

12   part of it stucco and part of it should be

13   bricks.

14        Q    So you would have stucco and brick

15   veneer over the metal for the front of the

16   building?

17        A    That was supposed to be.

18             MR. JUDD:   In the front of the

19        building?

20        Q    How long before the incident

21   happened -- do you remember the day the

22   incident happened?

23        A    Not exactly.

24        Q    Do you remember it was the first week

25   of June 2009?

1    A    Not exactly.

2    Q    How long before the incident happened

3  did you hire Orange County Concrete?

4    A    A few weeks.

5    Q    Did you make the decision to go with

6  the poured concrete instead of the cement

7  blocks before or after you hired Orange County

8  Concrete?

9    A    Before.

10    Q    Did you make the decision to go with

11  the poured concrete before or after Sharon

12  became involved with the building?

13         MR. POLISHOOK:  Objection to form.

14         THE WITNESS:  He was the engineer

15      that I went through all of the details of

16      what would be best.

17         MR. POLISHOOK:  Move to strike as

18      nonresponsive.

19    Q    Did Sharon participate in the

20  decision to go with the poured concrete?

21         MR. POLISHOOK:  Object to form.

22         THE WITNESS:  He gave me the options

23      and I decided by myself.

24    Q    Was he part of the discussion?

25         MR. POLISHOOK:  Objection to form.

1       He just answered.

2           THE WITNESS:  What do you mean by

3       participated?

4       Q    Before you made your final decision

5   had you gone over the various options with

6   Mr. Sharon?

7           MR. POLISHOOK:  Objection to form.

8           THE WITNESS:  He explained the

9       options to me.  He explained to me the

10      three ways to deal with the problem that

11      the building had, and I made a decision as

12      to which option to take.

13      Q    Did Sharon make any recommendation as

14  to which was the best option?

15          MR. POLISHOOK:  Objection to form.

16          THE WITNESS:  No.

17          MR. KULLER:  Could you read back the

18      last question and answer, please.

19      (The question and answer were read back.)

20      Q    I believe you had previously

21  testified that Sharon prepared some

22  specifications for the poured concrete?

23          MR. POLISHOOK:  Objection to form.

24          Just let him testify --

25          THE WITNESS:  He wrote out a plan