# Exhibit 2
# Part (1 of 2)

1             V O L U M E   II

2 UNITED STATES DISTRICT COURT

     EASTERN DISTRICT OF NEW YORK

3

     ------------------------------------------x

4

     EVEREST REINSURANCE COMPANY, A/S/O      :

5 FRITZ HOKEL and SYM REALTY,

6                     Plaintiffs,     :

7       - against -             : Docket No.

                                  CV 11 3427

8 COVA CONCRETE CORP., SHARON ENGINEERING,:

     P.C., ORANGE COUNTY SUPERIOR CONCRETE,

9 INC., SIMON DUSHINSKY, THE RABSKY GROUP,:

     LLC, HSD CONSTRUCTION, LLC, THE GOLD

10 DEVELOPMENT & MANAGEMENT, LLC, OSCAR P. :

     WALTERS and DEMERARA ENGINEERING, PLLC,

11

12                 Defendants.     :

     ------------------------------------------x

13

14

15                 1065 Avenue of the Americas

                 New York, New York

16

                 September 12, 2012

17                 10:45 a.m.

18

19           CONTINUED ORAL DEPOSITION of ISAAC

20 RABINOWITZ, a witness on behalf of HSD Construction,

21 LLC, herein, taken by the Defendants, pursuant to

22 Notice, held at the above-captioned time and place,

23 before Hanna Roth, Shorthand Reporter and Notary

24 Public of the State of New York.

25    Job No. NJ1337053

```
 1
 2    A P P E A R A N C E S:
 3        METHFESSEL & WERBEL, ESQS.
                    Attorneys for Plaintiffs
 4                      450 Seventh Avenue, Suite 1400
                        New York, New York 10123
 5                      (212) 947-1999
          By:           EDWARD M. TOBIN, ESQ.
 6
 7

          WHITE & McSPEDON, P.C.
 8                    Attorneys for Defendant Cova Concrete
                        875 Avenue of the Americas
 9                      New York, New York 10001
                        (212) 564-6633
10        By:           FRANCES NOREK HATCH, ESQ.
11
12        MORGAN MELHUISH ABRUTYN, ESQS.
                    Attorneys for Defendant Sharon
13                  Engineering, P.C.
                        651 West Mount Pleasant Avenue
14                      Livingston, New Jersey 07039
                        (973) 994-2500
15        By:           ERIC L. POLISHOOK, ESQ.
16
17        ABRAMS GARFINKEL MARGOLIS BERGSON, LLP
                    Attorneys for Defendant Orange County
18                  Superior Concrete
                        237 West 35th Street, 4th Floor
19                      New York, New York 10001
          By:           BRETT L. KULLER, ESQ.
20
21
          HAVKINS ROSENFELD RITZERT & VARRIALE, LLP
22                  Attorneys for Defendants Simon Dushinsky,
                    HSD Construction, LLC, The Gold
23                  Development & Management, LLC
                        1065 Avenue of the Americas, Suite 800
24                      New York, New York 10018
                        (212) 488-1598
25        By:           JONATHAN A. JUDD, ESQ.
```

I N D E X
TESTIMONY

| WITNESS | EXAMINED BY | PAGE | LINE |
|---------|-------------|------|------|
| Isaac Rabinowitz | Mr. Polishook | 142 | 6 |
| | Mr. Kuller | 193 | 9 |

RABINOWITZ EXHIBITS FOR IDENTIFICATION

| NO. | DESCRIPTION | PAGE | LINE |
|-----|-------------|------|------|
| 7 | Large scale set of plans for project | 170 | 9 |
| 7A | Smaller scale set of plans for project | 170 | 10 |
| 8 | AIA Document A-201-1997 | 234 | 20 |

(Exhibits retained by counsel.)

REQUEST FOR PRODUCTION OF DOCUMENTS

| DESCRIPTION | PAGE | LINE |
|-------------|------|------|
| HSD job file for project | 151 | 4 |
| Drawings, specifications and plans provided by Sharon not previously produced | 192 | 15 |
| Plans provided by Gold | 223 | 23 |

1

2 F E D E R A L     S T I P U L A T I O N S

3          IT IS HEREBY STIPULATED AND AGREED by and

4 between the attorneys for the respective parties

5 hereto that filing and sealing be one and the same

6 are hereby waived.

7          IT IS FURTHER STIPULATED AND AGREED that

8 all objections except as to the form of the question,

9 shall be reserved to the time of the trial.

10          IT IS FURTHER STIPULATED AND AGREED that

11 the within examination may be signed and sworn to

12 before any notary public with the same force and

13 effect as though signed and sworn to before this

14 Court.

15

16

17

18

19

20

21

22

23

24

25

1

2   N A O M I    J O N E S, a Hebrew interpreter, solemnly

3   swore to translate the following questions from

4   English to Hebrew and the answers from Hebrew to

5   English.

6   I S A A C    R A B I N O W I T Z, called as a witness,

7   having been duly affirmed through an interpreter by a

8   Notary Public of the State of New York, was examined

9   and testified as follows:

10  CONTINUED EXAMINATION BY MR. POLISHOOK:

11          Q.      Good morning, Mr. Rabinowitz.  My name is

12  Eric Polishook from Morgan Melhuish Abrutyn.  We met

13  when you were last deposed on August 8th or 9th.   I

14  represent Sharon Engineering.  I am going to ask you

15  some more questions today.  It's the same

16  instructions as the last time.

17          I will ask a question and then I will

18  give you time to answer.  Just answer my questions.

19  I understand also you may understand some English,

20  but like the last time, just listen to the

21  interpreter's Hebrew and answer in Hebrew.  If you

22  don't understand a question, please let me know so we

23  can make this easier.  If your attorney says the word

24  "objection" or someone says the word "objection,"

25  wait and your attorney will tell you whether to

1          Isaac Rabinowitz

2   answer the question or not.  Do you have any

3   questions?

4          A.     No.

5          Q.     Just to confirm, in the past 24 hours,

6   you haven't had any alcoholic drink or taken any

7   recreational or prescription drugs that would affect

8   your ability to testify or remember events from 2009.

9   Correct?

10         A.     No.

11         Q.     Following the incident on June 2nd, 2009,

12   did you see any Styrofoam in the area of the wall?

13         A.     I think so.

14         Q.     Did you take any photographs of the area

15   where the incident occurred, after the accident?

16         A.     No.

17                MR. JUDD:  Excuse me, just off the

18         record.

19                (Discussion held off the record.)

20         Q.     Where did you see the Styrofoam after the

21   incident?

22         A.     The place that there was the

23   construction.  The place that the accident occurred.

24   You could see that it happened there.  The Styrofoam

25   was between the wall and the cement.

1          Isaac Rabinowitz

2     Q.     Which wall, the wall that was being

3   built, the wall of the adjacent building or something

4   else?

5     A.     Between the new wall and what was built,

6   the cement of the new wall that was built.

7          MR. JUDD:  Excuse me just one second.  I

8          just want to tell my client to please wait until

9          the question is over before he starts to

10         respond.  Okay?  Thank you.

11         THE INTERPRETER:  I am translating the

12         best I could.

13    Q.     Can you describe the Styrofoam; meaning,

14   what color was it, how much of it was there when you

15   saw it after the incident?

16    A.     I don't remember.

17    Q.     Did you actually touch it?

18    A.     No.

19    Q.     How do you know that it was Styrofoam?

20    A.     I could see.  No?

21         MR. JUDD:  Off the record again.

22         (Discussion held off the record.)

23    Q.     Did you ever instruct Orange County to

24   use forms made of Styrofoam in pouring the concrete?

25         MR. KULLER:  Objection.

1          Isaac Rabinowitz

2          THE INTERPRETER:  I need the question

3     repeated.

4          (The record was read by the reporter.)

5     A.    I never gave any instructions how to

6     pour.  How to pour, is it necessary?  They should

7     know by themselves, alone.

8     Q.    Orange County should know by themselves?

9     A.    Yes.

10    Q.    That includes the use of forms?

11    A.    Clearly.

12    Q.    Did Ronan Sharon ever tell you to tell

13    Orange County to use Styrofoam forms?

14         MR. JUDD:  Objection to form.

15    A.    He didn't give such an instruction.

16    Q.    Did you ever witness personally Ronan

17    Sharon tell anyone from Orange County to use

18    Styrofoam forms?

19    A.    I don't know.

20    Q.    Did you ever review any writings for this

21    project regarding the use of Styrofoam forms before

22    pouring concrete?

23         MR. KULLER:  Objection to form.

24         MR. JUDD:  Object to form.

25    A.    I would like to tell him not off the

1              Isaac Rabinowitz

2     record.  There is no such thing as forms of

3     Styrofoam.

4              MR. KULLER:  You would know.

5              MR. JUDD:  Would you read that back.

6              (The record was read by the reporter.)

7         A.    There wasn't such a thing.

8         Q.    Did you ever prepare any writings

9     regarding the use of Styrofoam forms on a project?

10        A.    No.

11        Q.    You testified here at your last

12    deposition regarding forms that were used on site.  I

13    just have some followup questions on that.

14             Who ordered -- withdrawn. This may have

15    been asked the last time, but I don't recall the

16    answer.

17             Were the forms prefabricated or were they

18    put together onsite or something else?

19        A.    Onsite.

20        Q.    Who ordered the materials to be used to

21    construct the forms?

22        A.    The one who does the concrete.  The

23    person who takes care of the concrete prepares the

24    forms.

25        Q.    What I want to know is not who prepared

1              Isaac Rabinowitz

2    them, and I will get to that in a second.  Who

3    ordered the materials?

4         A.    He orders them, he prepares them and he

5    makes them, brings them.

6              MR. JUDD:  Who is he?

7              THE WITNESS:  The person from the

8         concrete, the cement.

9         Q.    In this case, was that Orange County

10   Superior Concrete?

11        A.    Yes.

12        Q.    I know I just asked you who ordered the

13   materials.  Who determined what materials would be

14   ordered?

15        A.    I don't understand.

16        Q.    Okay.  I know you just testified that

17   Orange County ordered the materials to be used for

18   the forms.  Did Orange County determine what

19   materials had to be ordered?

20        A.    Yes.

21        Q.    And then once the materials arrived on

22   the site, Orange County put together the forms?

23        A.    Yes.

24        Q.    What were the forms made of to assist in

25   the pouring of concrete at this job site?

1          Isaac Rabinowitz

2          MR. JUDD:  In any particular location, at

3     this job site or any particular floor at this

4     job site?

5          MR. POLISHOOK:  I am going to ask in

6     general at the job site.

7          MR. JUDD:  You're assuming it was the

8     same everywhere on the site.

9          MR. POLISHOOK:  Well, his testimony last

10    time was -- I need to see -- I just want to ask

11    that question.

12         MR. JUDD:  If you understand the

13    question, then you can answer it.

14         THE WITNESS:  I don't understand the

15    question.

16         MR. POLISHOOK:  I know he testified and I

17    don't like the interpreter's testimony on the

18    record.  I'd like his words, his testimony to

19    speak for itself.  I want it to be accurate.

20         Q.    Do you know what the forms were made of

21    that Orange County used at the site at 50 North First

22    Street?

23         A.    It's a special form that is used for

24    pouring cement.  It's a special form that's used for

25    pouring cement.

1                    Isaac Rabinowitz

2        Q.     What was that form made of?

3        A.     It has parts of metal, wood and metal.

4        Q.     Did Orange County submit invoices to HSD

5    for payment for the forms?

6        A.     When he left, he asked for money, so yes.

7        Q.     Were any invoices submitted in writing

8    specifically just for the materials and for the work

9    on the forms?

10       A.     No.

11       Q.     Did Orange County submit any invoices for

12   any work on the site?

13       A.     For preparation I don't pay anything.

14   The only thing I do pay is after he does the work,

15   after he prepares the cement.

16       Q.     So is it fair to say that after Orange

17   County did the work, they asked for one set of

18   payment and you provided one set of payment?

19              MR. KULLER:  Objection.

20              MR. JUDD:  Object to form.  Do you

21       understand the question?

22       A.     After the entire thing -- he just started

23   to work and the accident happened.  He only started.

24   He didn't even begin to do the work for which we

25   would have the invoice.  The invoice was not ready

Isaac Rabinowitz

1

2  yet because there was more work to be done before

3  that invoice should be submitted and then the

4  incident happened. Then the bank immediately stopped

5  payment and the lien was presented.

6          MR. JUDD:  Please read back that answer.

7          (The record was read by the reporter.)

8      Q.    Does HSD maintain a file with all

9  invoices and requisitions and payments for this

10 project?

11     A.    There was only one invoice when he asked

12 for money.

13     Q.    What about for any other work?

14     A.    There was a contract.  He sent the

15 invoice and then afterwards we tried to make an

16 agreement between us to reduce the lien, but the bank

17 didn't give that.  Then they sold it and he got the

18 money from the new guys.

19     Q.    What I want to know, not just for Orange

20 County but for any contractor or professional that

21 worked on the project, does HSD still have copies of

22 any requisitions or invoices or checks for any

23 contractor or any work on site?

24         MR. JUDD:  I object to the form, but if

25     he can answer it, go ahead.

1                    Isaac Rabinowitz

2          A.        There used to be.  At the moment, I don't

3    know where.

4                    MR. POLISHOOK:  I will just request, and

5          I will follow up in writing, for the payment

6          file.  I make a followup request for any kind of

7          job file that HSD has on the project.

8                    MR. JUDD:  Please put all requests in

9          writing and we will take them under advisement.

10                   Off the record.

11                   (Discussion held off the record.)

12                   MR. KULLER:  We made a request in writing

13         for the entire job file that was maintained by

14         HSD, Gold and the Rabsky Group with respect to

15         this construction project.  Counsel for HSD,

16         Gold and the Rabsky Group objected to providing

17         that job file.  They also represent Dushinsky.

18                   It's our position in this case that to

19         the extent that there is a job file maintained

20         by either The Gold Development & Management or

21         the Rabsky Group or HSD Construction, that we

22         would certainly be entitled to review that job

23         file.

24                   We are going to follow up again to ask

25         for a job file for which we will make the

1          Isaac Rabinowitz

2     appropriate application to the Court and we will

3     reserve our right to continue the deposition to

4     the extent necessary based on production of any

5     documents subsequent to today.

6          MR. JUDD:  And we, of course, stand by

7     the objections that we made to the demand.

8          MR. POLISHOOK:  I am going to move on.

9     I'm going to show the witness what was marked as

10    Rabinowitz 3 at Mr. Rabinowitz' first

11    deposition, dated August 9, 2012.  It's a

12    two-page document.  The first page says Sharon

13    Engineering Fax Transmission, dated May 11.  The

14    second page is on graph paper with the Sharon

15    Engineering insignia on the top.

16         I'm going to show this to the witness and

17    I'm going to ask him to take a look at it.  I

18    don't have any questions yet.  Just making sure.

19    He doesn't need to answer, unless I ask a

20    question.

21         (Witness perusing document.)

22    Q.    Mr. Rabinowitz, have you ever seen what

23    was marked as Rabinowitz 3, or a copy of it, before

24    today?

25         MR. JUDD:  Only if you remember.

1    Isaac Rabinowitz

2   MR. POLISHOOK: Everything is only if he

3  remembers.

4   A. I don't remember.

5   Q. Do you know who Chani is that's referred

6 to on the first page?

7   A. No.

8   Q. Back in May 2009, were you employed or

9 were you a member or officer of the Rabsky Group?

10   A. Yes.

11   Q. And did you receive faxes that were sent

12 to the Rabsky Group?

13   A. The office receives.

14   Q. Do you know who prepared Rabinowitz 3;

15 meaning, any of the writings? Let me withdraw the

16 question.

17   MR. JUDD: Do you want to ask if he

18  recognizes the writing?

19   MR. POLISHOOK: I'm just going to the

20  first page of Rabinowitz 3.

21   Q. Do you recognize the handwriting? I'm

22 not asking if you understand what it says. I

23 understood your testimony about reading English. I

24 am wondering if you recognize the handwriting.

25   A. I don't know.

1                    Isaac Rabinowitz

2        Q.      The second page of Rabinowitz 3, do you

3    recognize any of the handwriting?

4        A.      No.

5        Q.      If you need to take a call, I would

6    rather you take the call and let's take a break.  We

7    want to get your full attention.  Unless a question

8    is pending, if you need a break at any time for a

9    personal matter, I don't mind.  We can take a break.

10       A.      Okay.

11            MR. JUDD:  Off the record.

12            (Discussion held off the record.)

13            MR. POLISHOOK:  If he needs to do

14       anything, I don't have a problem with it.  I

15       just want him to pay attention to my questions.

16            MR. JUDD:  I told him before if he needs

17       to break, we can do that.

18       Q.      If you would receive a fax in your

19   business capacity that had English writing on it back

20   in 2009, would you have had someone assist you in

21   translating it?

22       A.      Yes.

23       Q.      Who would have assisted you in

24   translating it?

25       A.      Generally, Dushinsky.

1                    Isaac Rabinowitz

2        Q.     Do you recall ever discussing the

3    contents of Rabinowitz 3 with Mr. Sharon?

4        A.     I don't know what is written in it.

5        Q.     That's because you can't read English?

6        A.     Yes.

7        Q.     Did you ever ask Mr. Sharon to translate

8    this document?

9        A.     No.

10       Q.     Do you recall ever asking Mr. Dushinsky

11   to translate this document for you?

12       A.     No.

13       Q.     And just referring to the second page of

14   Rabinowitz 3, you don't know what that says, right?

15       A.     No.

16       Q.     I'm going to show you what was marked --

17   leave this document here, I may go back to it.

18              I am going to show what was marked

19   Rabinowitz 4, dated 8/9/2012.  You can take a look at

20   that.

21              MR. JUDD:  Off the record.

22              (Discussion held off the record.)

23       Q.     You can take a look at this and just look

24   up when you're done.

25       A.     I see what it is.  What is it that you

1              Isaac Rabinowitz

2    would like to ask?

3         Q.    I'm going to ask some questions.  Until I

4    ask a question, you don't need to answer.  If I don't

5    ask a question, you can just sit there.

6              MR. JUDD:  Only answer what he is asking

7         you.

8         Q.    Have you ever seen the document marked as

9    Rabinowitz 4, or a copy of it, before today?

10        A.    I don't remember.

11        Q.    There is some additional handwriting

12   that's on Rabinowitz 4 that was not on the second

13   page of Rabinowitz 3.  Do you recognize any of this

14   additional handwriting; meaning, do you know whose

15   handwriting this is?

16        A.    No.

17        Q.    And I take it because you don't read

18   English that you don't understand what it says.

19             MR. JUDD:  Object to form.

20        Q.    You can answer.

21        A.    No.

22        Q.    Well, that's a separate question.  I hope

23   it won't be objected to.

24             Do you understand what any of the writing

25   on Rabinowitz 4 says?

1          Isaac Rabinowitz

2      A.    I can explain what is my understanding as

3  to why this form was created.

4      Q.    I will show you.  Going back to

5  Rabinowitz 3, do you understand any of the writing on

6  the second page of Rabinowitz 3?

7      A.    I don't understand because I see numbers.

8  Numbers I do know.

9      Q.    You understand numbers but not the

10  letters?

11      A.    Numbers I know.

12      Q.    Do you know what the numbers mean on

13  Rabinowitz 3?

14      A.    As principle, I understand.  I don't

15  understand every detail.  As a principle of this, I

16  understand what is meant here.

17      Q.    What's your understanding of what was

18  meant on Rabinowitz 3?

19      A.    I understand that he means which steel

20  rebar to use when you pour the concrete.

21      Q.    Looking at Rabinowitz 3, do you

22  understand it to refer to anything besides which

23  rebar to use?

24      A.    No.

25      Q.    Does Rabinowitz 3 specify what type of

1              Isaac Rabinowitz

2    forms to use in the pouring of concrete?.

3         A.    I don't know.

4              MR. JUDD:  I need to hear that again.

5              (The record was read by the reporter.)

6              MR. JUDD:  Offer the record.

7              (Discussion held off the record.)

8         Q.    Going back to Rabinowitz 3, do you see

9    anywhere where it provides instructions for the type

10   of forms to use in pouring concrete?

11             MR. JUDD:  Asked and answered.

12        A.    I said before, I don't know.

13             MR. JUDD:  Right.  He said that already,

14        that he didn't know.

15             MR. POLISHOOK:  I asked it differently.

16             MR. JUDD:  You asked which forms to use.

17             MR. POLISHOOK:  It's fine.  His answer is

18        what his answer is.

19        Q.    Look at Rabinowitz 4.  In your opinion,

20   does that provide any details, besides the use of

21   rebar?

22        A.    I don't know.

23        Q.    In your opinion or from your reading of

24   this, does Rabinowitz 4 provide any details regarding

25   the use of the type of concrete forms?  I mean the

1                    Isaac Rabinowitz
2    forms for concrete pouring.
3          A.    I don't know.
4          Q.    I'm going to ask the question again
5    because I misspoke.
6                In your opinion, from your reading, does
7    Rabinowitz 4 provide any details regarding the type
8    of forms to use in the pouring of concrete?
9          A.    You asked me again and again.  I said I
10   don't read and I don't know.
11         Q.    Prior to the incident, did you ever
12   discuss with Mr. Sharon the use of the type of forms
13   for the pouring of concrete?
14         A.    No.
15               MR. JUDD:  Read that back.
16               (The record was read by the reporter.)
17         Q.    How did Orange County know what materials
18   to order for the forms?
19               MR. JUDD:  I object to the question
20         insofar as it calls for him to know what Orange
21         County thought.  But if you can answer it, go
22         ahead.
23         A.    I don't know what to answer.
24               MR. JUDD:  Do you understand the
25         question?

1        Isaac Rabinowitz

2        THE WITNESS: I understand the thing, but

3     as I said before, everything, all the things

4     involving how to do it or what to do is him, not

5     me.

6        Q.    When you say "him," you mean Orange

7   County, the concrete contractor?

8        A.    Yes.

9        Q.    Did you ever discuss the type of forms or

10   the materials with anyone from Orange County before

11   the incident?

12        A.    We spoke about the work and what needs to

13   be done and they decide themselves.

14        Q.    Who did you speak with at Orange County,

15   by name?

16        A.    Mr. Falkowitz, Yoel.

17        MS. NOREK-HATCH: Can we have a spelling

18     of that? I'm looking at the prior transcript.

19     I think it's incorrect.

20        MR. POLISHOOK: Let's have Brett give it

21     to us.

22        MR. KULLER: I believe it's

23     F-A-L-K-O-W-I-T-Z, first name J-O-E-L.

24        Q.    Did you ever discuss forms with

25   Mr. Falkowitz's father, Martin?

1      Isaac Rabinowitz

2      A.      No. The first time I ever saw him was

3  here, when he was at the last deposition.

4      Q.      Okay.   Thanks.  Did you witness Orange

5  County putting together the forms on site?

6      A.      Yes.

7      Q.      These were made of metal and wood?

8      A.      Yes.

9      Q.      Did you witness the use of any forms made

10 of Styrofoam prior to the incident?

11     A.      No.

12     Q.      Did you make any complaints to Orange

13 County regarding the materials they were using or how

14 they were constructing the forms prior to the

15 incident?

16     A.      No.

17     Q.      Did you make any complaints to Mr. Sharon

18 about the materials that were to be used for the

19 forms or how they were to be constructed prior to the

20 incident?

21     A.      No.

22             MR. JUDD:  Off the record.

23             (Discussion held off the record.)

24     Q.      Just a couple more questions regarding

25 forms.

1          Isaac Rabinowitz

2          Did anyone ever complain to you about the

3   materials that were used for the forms or how they

4   were being constructed prior to the incident?

5          A.    No.

6          Q.    Did you ever prepare any writings

7   complaining about the forms prior to the incident?

8          MR. JUDD:  Object to form.

9          A.    No.

10         Q.    Looking at Rabinowitz 3, do you know the

11  circumstances as to how this document was created?

12         MR. JUDD:  Object to form, but he can

13         answer.

14         A.    No.

15         Q.    Do you know whether you ever received a

16  copy of Rabinowitz 3 faxed to you at the Rabsky

17  Group?

18         A.    I don't remember.

19         Q.    Look at Rabinowitz 4.  Do you know the

20  circumstances under which this document was created?

21         MR. JUDD:  Object to form.

22         A.    No.

23         Q.    I think it was asked.  I just want to be

24  clear.

25         On Rabinowitz 4, there is some writing

1            Isaac Rabinowitz

2   that was not on Rabinowitz 3.  Do you know whose

3   handwriting that is?

4        A.    No.

5        Q.    Did you ever speak to Ronan Sharon or

6   anyone from Sharon Engineering about the use of rebar

7   at this project?

8            MR. JUDD:  I am just going to ask you to

9        please limit the time of that question.

10           MR. POLISHOOK:  Let me withdraw the

11       question.  Good idea.  Thanks.

12       Q.    Prior to the incident, did you ever

13  discuss the use of rebar with Ronan Sharon or anyone

14  from Sharon Engineering?

15       A.    I accepted him as an engineer and we

16  discussed what needs to be done.  He was taking over

17  whatever needs to be done regarding the concrete and

18  everything.

19           MR. JUDD:  Objection.  If you can repeat

20       the question or read it back.

21       Q.    I just have very specific questions and

22  I'm not going to cut you off or anything you have to

23  say, but I do need you to listen to the question and

24  answer my questions.

25           MR. POLISHOOK:  I move to strike that

1    Isaac Rabinowitz

2    answer as nonresponsive.  Counsel objected to

3    form.

4         MR. JUDD:  That's right.  Objection.

5         MR. POLISHOOK:  The thing I said after,

6    where I gave a little incentive, I'm not going

7    to --

8    Q.    I'm going to let you say what you need to

9    say, Mr. Rabinowitz.  It's your deposition.  But I

10   ask that you listen to the question and just answer

11   my question and I am going to want you to answer that

12   question over objection.

13        MR. JUDD:  I just want to ask you,

14        Mr. Polishook, if you could limit the question

15        about the use of rebar to a certain portion of

16        the building or certain time period.

17        MR. POLISHOOK:  Okay.  Well, I'm going

18        to -- I thought I did that.  Maybe I never asked

19        that question.  I'm going to withdraw the

20        question.  Let me ask a new question and have

21        the witness listen to it.

22   Q.    Did you ever discuss the use of rebar in

23   conjunction with the wall adjacent to 48 North First

24   Street with Mr. Sharon prior to the incident?

25   A.    Yes.

1              Isaac Rabinowitz

2      Q.     When did you discuss that with Ronan?

3      A.     When I took him as an engineer.

4      Q.     Do you know what date or dates the

5  conversation or conversations were?

6      A.     I don't know.  I don't remember.

7      Q.     What were the sum and substance of the

8  communication or the communications; meaning, what

9  did Ronan say what did you say?

10     A.     We spoke about what will be the best

11 thing to be done here and he said concrete wall, and

12 then the decision was made to do that.

13         MR. POLISHOOK:  I'm going to move to

14     strike that answer as nonresponsive.

15     Q.     I'm asking specifically whether you and

16 Ronan had any conversations regarding rebar and what

17 the sum and substance of those communications were,

18 just specifically about rebar.

19     A.     We didn't speak specifically about rebar.

20 We spoke in general terms and then he makes the plan

21 and then we spoke about the plan.

22     Q.     Besides Rabinowitz 3 and Rabinowitz 4,

23 are you aware of any other pre-accident writings

24 regarding the use and specification for rebar for the

25 wall adjacent to 48 North First Street?

1          Isaac Rabinowitz

2     A.     It's not known to me.

3     Q.     Did you witness -- withdrawn.

4            Prior to the incident, did you witness

5     any rebar at the project in the vicinity of the area

6     of the wall adjacent to 48 North First Street?

7            MR. JUDD:  Object to the form, but go

8        ahead.

9     A.     Inside the wall or next to the wall?

10    Q.     Well --

11    A.     What do you want to know?  Inside the

12    forms or outside?

13    Q.     Let me back up with a question.  I

14    withdraw the question.

15           I don't know if the question was asked

16    the first time.  Are you an engineer?

17    A.     No.

18    Q.     What is your lay opinion on the use of

19    rebar?

20           MR. JUDD:  I object to the form.  I don't

21        really understand the question.

22           MR. KULLER:  Objection.

23    Q.     What is rebar used for?

24           MR. JUDD:  Do you know what rebar is used

25        for?

1           Isaac Rabinowitz

2       A.      Yes.

3       Q.      What?

4       A.      You put it inside the cement.  It's part

5   of the material in the cement.

6       Q.      And what was it being used for at this

7   project?

8       A.      Same thing.

9       Q.      Was any rebar placed or installed with

10  the wall adjacent to 48 North First Street prior to

11  the incident?

12      A.      Yes, they did.

13      Q.      And who did the installation or

14  placement?

15      A.      Orange County.

16      Q.      Did you see this?  Did you see the work

17  done before the incident?

18      A.      Yes.

19              MR. JUDD:  I object because I'm not sure

20          if you're asking did he see the work being done

21          or did he see the result of the work.

22      Q.      Did you see Orange County installing or

23  placing the rebar prior to the incident?

24      A.      I saw that they were working there.  They

25  were preparing the forms.  They were working there

1                    Isaac Rabinowitz

2    and they prepared the rebar and the forms.  I saw

3    them preparing it.

4         Q.    Did you make any complaints about Orange

5    County's preparation of the rebar prior to the

6    incident?

7         A.    No.

8         Q.    Did Orange --

9               MR. JUDD:  I'm sorry, you're referring to

10        complaints to Orange County or anyone?

11              MR. POLISHOOK:  Read back the question.

12              (The record was read by the reporter.)

13        Q.    Who ordered the rebar?

14        A.    Orange County.

15        Q.    Did you make any complaints to Orange

16   County about the rebar that was ordered prior to the

17   incident, either the brand, the dimensions or

18   anything else?

19              MR. JUDD:  That's been asked and answered

20        in your previous question.

21              MR. POLISHOOK:  It's a little more

22        specific.

23        A.    No.

24        Q.    Did Orange County complain to you at all

25   about the rebar it ordered, either the type, the

1               Isaac Rabinowitz
2    brand or the specifications prior to the incident?
3         A.    No.
4         Q.    I didn't ask before, did Orange County
5    make any complaints to you about the forms that they
6    ordered and installed prior to the incident?
7         A.    No.
8         Q.    Who supplied the actual concrete that was
9    being poured prior to the time of the incident?
10        A.    Everything is being ordered by Orange
11   County.
12        Q.    Did Orange County determine the brand of
13   the concrete that it ordered?
14        A.    Yes.
15        Q.    Did Orange County determine the type of
16   concrete it ordered?
17        A.    Yes.
18        Q.    Did you ever complain to Orange County
19   about the concrete that it ordered and was using at
20   the project prior to the incident?
21        A.    No.
22        Q.    Did Orange County complain to you at all
23   about the concrete that it ordered and was using at
24   the project prior to the incident?
25        A.    No.

1                    Isaac Rabinowitz

2          MR. POLISHOOK:  We are going to mark the

3     large set of plans that counsel for HSD brought

4     today.  Those will be Rabinowitz 7.  And then

5     let's mark as Rabinowitz 7A the small set of

6     plans that Mr. Volpe mailed to everyone on

7     Monday.  On September 10, he mailed them.  He

8     also e-mailed me on September 11.

9                    (Rabinowitz Exhibit No. 7, large scale

10    set of plans for project; No. 7A, smaller scale

11    set of plans for project, was received and

12    marked for identification.)

13         MR. POLISHOOK:  I am just going to put on

14    the record that we're going to withdraw

15    Exhibit 7A and just focus on Exhibit 7, which

16    counsel for HSD has represented is all of the

17    plans and documents that they sent out, the big

18    copies of what they sent out on a CD on

19    September 10.  That's accurate?

20         MR. JUDD:  It's my understanding that was

21    what was sent to you.

22         MS. NOREK-HATCH:  I just want to

23    represent, for the record, that there are four

24    different sets of plans.  The first one starts

25    with a capital A. The second set starts with a

1        Isaac Rabinowitz

2  capital T.

3        MR. POLISHOOK:  I am going to do this.

4  There is a set in an A set, with a cover page,

5  architectural set with the name Alan Patrick

6  Bruton, A-triple zero and so forth.  Design is

7  DIM.  The structural engineer is Steven Kaplan,

8  dated 3/20/06.  The last page is A-024.

9        The next set we're looking at also says

10  Architectural, DOB, set of the architect, Aston

11  Architecture, PC.  The first drawing is

12  F-001.00, dated 8/3/09, and that goes up to

13  certain notes which have G notes and there are

14  certain Z notes and certain A notes.  These are

15  post accident drawings.

16        The next set here is still part of

17  Exhibit 7.  They're drawings with a seal from

18  the letterhead of Demerara Engineering, Inc.,

19  dated 3/9/08.  They are a set of drawings, S-1

20  through S-15.

21        The last set within Exhibit 7 are Sharon

22  Engineering notes, S-001.001 through S-201.001.

23  These are dated June 12, 2009, also post

24  incident.

25        Q.    Without repeating or mischaracterizing

1          Isaac Rabinowitz

2  your testimony, Mr. Rabinowitz, you've testified as

3  to plans that you were shown for this project.  I'd

4  ask you to take your time, look through Exhibit 7,

5  and first identify any plans, drawings and

6  specifications that you recall being shown to you at

7  any point.

8          MR. JUDD:  Objection to the form.  If he

9      can answer, he may.

10         MR. POLISHOOK:  I think the witness

11     should take his time to look through this.

12         MR. KULLER:  I will give him tabs so he

13     can mark them as he goes through these.

14         MR. POLISHOOK:  Off the record.

15         (Discussion held off the record.)

16         MR. JUDD:  Mr. Polishook, you have asked

17     the witness to identify any of these records

18     that he recognized, correct?

19         MR. POLISHOOK:  It's not a matter -- when

20     you say "recognize," it's not that he recognizes

21     it.  It can be a plan that he recalls seeing,

22     any of them, in conjunction with this

23     construction project, that he saw it at any time

24     in conjunction with the project, either before

25     or after the incident.

1       Isaac Rabinowitz

2           MR. JUDD:  Okay, if he's ever seen it

3       before.

4           (Witness reviewing plans.)

5       Q.    I've just shown you this exhibit.  You

6   took a long time to look at Exhibit 7.  My question

7   right now is, you've spoken sort of vaguely regarding

8   a plan or plans that Sharon presented to you for

9   concrete pour plans shown to you.

10          Are there any documents within Exhibit 7

11  that Sharon provided to you for the concrete pouring

12  of the wall adjacent to 48 North First Street that he

13  provided to you prior to the incident?

14          MR. JUDD:  Objection to form.  If he

15      understands that question, he may answer it.

16          MR. POLISHOOK:  Do you want to repeat the

17      question to him?

18      A.    I can't show you specifically where the

19  details are because I don't read well.  But one thing

20  is clear.  When I took the company, accepted the

21  company to make a concrete wall, and what works with

22  all of the companies, each subcontractor who has any

23  questions and expectations and details, has to turn

24  to the architect.  If it concerns the architect, it's

25  the architect.  If it concerns engineering, then it's

1          Isaac Rabinowitz

2    the engineer.

3          Q.     Were you present for any in-person

4    communications between Orange County and Sharon prior

5    to the incident?

6          A.     I know that I requested from Sharon, I

7    asked Sharon to make a decision as to who is to make

8    the decision.  We made the decision together.

9               MR. POLISHOOK:  I will move to strike the

10              answer as nonresponsive.  You have to

11              respectfully just listen to my question and

12              answer the question.  I appreciate your trying

13              to help.

14         Q.     Prior to the incident, were you ever

15    present for any in-person communications between

16    Sharon and Orange County?

17              MR. JUDD:  Regarding what?

18              MR. POLISHOOK:  At all.

19              MR. JUDD:  Regarding the construction of

20              this particular wall?

21              MR. POLISHOOK:  Just in general.

22              MR. KULLER:  That's an appropriate

23              question.

24              MR. POLISHOOK:  I think he answered last

25              time.  I'm trying to clear it up.  Did he answer

Isaac Rabinowitz

1
2      this or not?

3                    THE INTERPRETER:  No.

4           A.      I don't remember.

5           Q.      Did you participate in any phone calls in

6      which you were on the line and so were Sharon and

7      Orange County about this project before the incident?

8           A.      I know that Orange County told me that if

9      there are questions, whom should they turn to, and I

10     sent them to Sharon.

11          Q.      But what I'm asking specifically, were

12     you ever on the phone when Orange County spoke to

13     Sharon?  I need to know what you personally

14     witnessed.

15          A.      I don't remember.

16          Q.      Did anyone from Orange County tell you

17     that they spoke to Sharon prior to the incident about

18     this project?

19          A.      I think so.

20          Q.      Who from Orange County told you they

21     spoke to Sharon about this project and when?  I don't

22     want you to guess as to any of these questions.  I am

23     asking very specific questions.

24          A.      In Orange County I only spoke with Yoel,

25     with Joel.

1          Isaac Rabinowitz

2          MR. JUDD:  I'm sorry, off the record.

3          (Discussion held off the record.)

4     Q.    When did Joel tell you that he spoke to

5 Sharon prior to the incident?

6     A.    Details I don't remember, but it was

7 during the period that he was working there.

8          MR. JUDD:  I just object because I don't

9          think there is a basis for that question.  I

10          don't think he said there ever definitely was

11          such a conversation.

12     Q.    Do you know the sum and substance of any

13 communications between Sharon and Orange County prior

14 to the incident?

15     A.    No.

16     Q.    At any time prior to the incident, did

17 Mr. Sharon tell you what drawings or specifications

18 by the prior engineers or architects that he

19 reviewed?

20     A.    No, no.

21          MR. KULLER:  Please read back that

22          question.

23          (The record was read by the reporter.)

24     Q.    I'm going to show you what was marked

25 Rabinowitz 5 from 8/9/12, which is a June 30, 2009

1                    Isaac Rabinowitz

2    letter from Ronan Sharon to Brian Y. Winter of the

3    New York City Building Department.

4              Rabinowitz 6 is from 8/9/12, a letter

5    from Ronan Sharon to Simon Dushinsky at Rabsky Group.

6              You can take a look at these two

7    documents.  I'm first going to ask about Exhibit 6,

8    actually.

9              Have you ever seen the document that's

10   marked as Rabinowitz 6, or a copy of it, before

11   today?

12        A.    I heard of it.

13        Q.    When you say you heard of it, again, I

14   don't want to know about any conversations you had

15   with your lawyer here.

16              How or when did you hear of it?

17        A.    This was a letter that was written after

18   the accident, where Sharon needed to report it to the

19   Building Department about what happened, about the

20   accident.

21        Q.    There are two letters here, Rabinowitz 5,

22   which is written to the Building Department.  I'm

23   asking about Exhibit 6, the letter from Sharon to

24   Mr. Dushinsky.

25              Have you seen it or are you aware of that

1                Isaac Rabinowitz

2    letter?

3         A.    I heard from Dushinsky.

4         Q.    And what did Dushinsky say?

5         A.    I don't remember.

6         Q.    Did Mr. Dushinsky -- I understand you

7    don't read English.  Did Mr. Dushinsky read this

8    letter to you?

9         A.    He read it.

10        Q.    And did he offer any -- did Simon offer

11   any comments about it to you, like his opinion?

12        A.    He didn't continue.  There was nothing to

13   answer.  Everything stopped.

14        Q.    As you sit here today, do you recall what

15   your opinion was when Simon told you about the letter

16   or read it to you?

17             MR. JUDD:  I'm sorry, you --

18             MR. POLISHOOK:  I will withdraw the

19        question and ask it more artfully.

20        Q.    Do you recall if you offered any opinions

21   when Mr. Dushinsky read the letter to you?

22             MR. JUDD:  Object to form.  Offered

23        opinions to who?

24             MR. POLISHOOK:  Did he offer any opinion

25        to Simon when Simon read the letter.

1              Isaac Rabinowitz

2      A.    I don't remember.

3      Q.    Did you offer any opinions to Mr. Sharon

4  or have any agreement or disagreement after Simon

5  read you the letter?

6            MR. JUDD:  Object to the form.  If he

7        understands the question, he can answer.

8      A.    I don't recall that we answered.

9      Q.    I'm just going to read you part of that

10  letter, Paragraphs 3 and 4.  It will be easier.

11            MR. KULLER:  The translator can read

12        Paragraphs 3 and 4 to the witness.  If no one

13        objects, I will read it to the reporter and then

14        she will translate it separately for the

15        witness.

16            MR. JUDD:  Wouldn't it be better to just

17        ask him a specific question?  Off the record.

18            (Discussion held off the record.)

19            MR. POLISHOOK:  I'm going to give

20        Mr. Sharon's September 15, 2009 letter to the

21        reporter.  She is going to type in Paragraphs 3

22        and 4, starting at "Close inspection."  Then the

23        interpreter is going to interpret it for the

24        witness so I can ask some questions.

25

1    Isaac Rabinowitz

2    PARAGRAPH 3: "Close inspection of the

3    collapse, done from inside of #48 indicated that

4    a wall portion of approximately 20 feet long and

5    almost full height at the third floor has

6    consisted of 8 inch brick construction and has

7    buckled under the hydrostatic pressure of the

8    weight of the adjacent concrete pour.

9    Conversation with the construction super

10   indicated that they were pouring the concrete

11   wall in 2 feet lift, using just a Styrofoam

12   board against the existing brick wall.  Since no

13   form was used along the exterior face of the

14   proposed wall, the hydrostatic pressure of the

15   wet concrete was borne directly by the brick

16   wall of the adjacent building.  When that

17   pressure exceeded a certain capacity, the brick

18   wall failed and allowed a large amount of wet

19   concrete to flow into the floor of the adjacent

20   apartment."

21   PARAGRAPH 4: "Standard procedures for

22   pouring concrete walls call for placing forms

23   along both sides of the wall and connecting them

24   with steel ties.  Double sided forms are widely

25   available for rental or purchase.  Experienced

1                Isaac Rabinowitz

2      contractors use these forms for most typical

3      wall construction.  Any atypical pour needs to

4      be brought to the attention of the engineer for

5      review and approval.  There is no indication

6      this was ever done.  Clearly, the lack of such

7      forms and reliance on an old, thin brick wall as

8      a 'form' caused this accident."

9          Q.    After hearing that, do you agree or

10 disagree with Mr. Sharon's opinions, if you have an

11 opinion?

12          A.    Sharon is describing what he saw.

13          Q.    Do you disagree with any of his

14 conclusions?

15          MR. KULLER:  Objection.

16          MR. JUDD:  I object also because he is

17      not an engineer.

18          MR. POLISHOOK:  I am asking what his lay

19      opinion is, if he has one.  If he doesn't have

20      one, he doesn't have one.

21          MR. TOBIN:  You may want to lay a

22      foundation, ask what his lay opinion is.

23          Q.    Do you have any opinion regarding

24 Mr. Sharon's conclusions, and if so, what is your

25 basis?

1                    Isaac Rabinowitz

2        A.      What does that matter?  He is the

3    engineer and he's the one who knows.

4        Q.      Did you disagree with any of his

5    conclusions?

6                MR. JUDD:  Objection, again.

7        A.      This was the story and this is what

8    happened.

9        Q.      After the incident, did you speak to Tim

10   Lynch of the Department of Buildings?

11       A.      Regarding -- what is the question?

12       Q.      With regard to the accident.

13       A.      We spoke that same night to figure out

14   how to support the building, the neighbor's building.

15       Q.      Did you offer any opinions to

16   Mr. Lynch about why the incident happened?

17       A.      We didn't speak of that.

18       Q.      Did you speak to anyone from the City or

19   Department of Buildings about the cause of the

20   incident?

21       A.      No.

22                MR. JUDD:  Off the record.

23                (Discussion held off the record.)

24       Q.      Following the incident, did you speak to

25   Mr. Walters about the incident?

1               Isaac Rabinowitz

2       A.    Who is Walters?

3       Q.    Oscar Walters from Demerara.

4       A.    I called Sharon.  Sharon was with me

5  there that same night.

6       Q.    What I want to know is, did you speak to

7  Mr. Oscar Walters of Demerara about the incident at

8  any time after the incident?

9       A.    I spoke to Gold and Gold spoke to him.

10      Q.    But you didn't speak to Walters directly

11 after the incident?

12      A.    I didn't.

13      Q.    Who from Gold did you speak to?

14      A.    The owner, the landlord.

15      Q.    Is there a Mr. Gold or someone else from

16 Gold?

17      A.    The name is Meyer Leib.

18            MS. NOREK-HATCH:  How do you spell that?

19            THE INTERPRETER:  M-E-Y-E-R  L-E-I-B.

20      Q.    Did Mr. Leib tell you about his

21 conversations with Mr. Walters?

22      A.    We did speak, but I don't remember about

23 what.

24      Q.    Did you overhear Mr. Sharon speak to

25 anyone from the Department of Buildings about the

1                     Isaac Rabinowitz

2   cause of the incident?

3        A.     He spoke with Tim Lynch.

4        Q.     And do you recall what he said?  Let me

5   withdraw the question.

6               When you spoke to Sharon, what language

7   did you guys speak, Hebrew?

8        A.     I speak with him in Hebrew.

9        Q.     When Mr. Sharon spoke to Tim Lynch, did

10  they speak English?

11       A.     For sure.

12       Q.     Did you understand what they were saying?

13       A.     No.

14       Q.     At any time since the accident, besides

15  to your lawyer, did you prepare a written statement

16  or incident report about what happened?

17       A.     No.

18       Q.     Besides being called by your lawyer, did

19  anyone ever call you on the phone or come visit you

20  and ask you orally what happened?

21       A.     No.

22       Q.     Have you ever given a deposition, not in

23  this case but in any other case, regarding this

24  incident?

25       A.     Thank God, no.

1              Isaac Rabinowitz

2      Q.     Was there a control inspector that was

3  retained to perform services on the site prior to the

4  accident?

5      A.     I don't remember.

6      Q.     Have you ever heard of an company Impact,

7  which performs control services, control inspections,

8  I mean?

9      A.     There was such a thing.

10     Q.     Did Impact perform services at this

11 project?

12     A.     He gave us, yes.

13     Q.     Who retained Impact?

14     A.     He was the previous contractor.

15     Q.     Did you ever see any contract between

16 Impact and the prior contractor?

17     A.     No.

18     Q.     Let's cut to the chase.  Are you aware

19 whether Impact performed any controlled inspections

20 in conjunction with the pouring of concrete on this

21 project?

22     A.     I don't remember.

23     Q.     Do you have any documents in your file

24 from Impact?

25     A.     No.

1                    Isaac Rabinowitz

2        Q.      Are you aware of any oral or written

3    communications between Sharon and Impact prior to the

4    incident?

5        A.      I don't remember.

6        Q.      Did you ever see any documents prepared

7    by Mr. Walters or anyone from Demerara following the

8    incident about the incident?

9                MR. JUDD:  Let her finish translating.

10       A.      No.

11       Q.      Did you personally witness, either in

12   person or on the phone, Sharon provide any

13   instructions to Orange County?

14       A.      You've asked that question before.

15       Q.      It's a little different.

16               MR. KULLER:  He said, I believe --

17               MR. POLISHOOK:  I don't want to hear what

18       you think he said.

19               MR. JUDD:  As to how to pour the

20       concrete?

21               MR. POLISHOOK:  Yes.  Let me withdraw the

22       question.  I will say it again.

23       Q.      Did you personally witness, either on the

24   telephone or in person, Sharon provide any

25   instructions to Orange County in conjunction with the

1          Isaac Rabinowitz

2   concrete pouring?

3          MR. JUDD:  Prior to the incident.

4      A.     What I understand is that he showed a

5   previous letter.  You showed us a letter and the

6   plans.  I gave Orange County Sharon's plans.

7          MR. POLISHOOK:  Ask him to use proper

8      names.

9      A.     I gave Orange County -- I instructed

10  Orange County to work with Sharon's plans.  Any

11  question he had, he had to refer to Sharon.  If

12  Orange County had any questions, these must be the

13  answers that Sharon gave to Orange County as a

14  response to their query.

15     Q.     You're referring to Rabinowitz 3?

16     A.     Yes.  This is what that is, my

17  understanding.

18     Q.     A couple questions.  I'm going to move to

19  strike the portion that is not responsive.  Let me

20  clear something up.

21          I want to know not what you think should

22  have happened, but I want to know what you personally

23  witnessed, without guessing.

24          MS. NOREK-HATCH:  I am going to object to

25      the recharacterization.  It didn't sound like

1           Isaac Rabinowitz

2      this witness was guessing.  It sounded like he

3      was saying what he recollected.  To that extent,

4      I have an objection to you mischaracterizing his

5      testimony.

6           MR. POLISHOOK:  I'm not trying to

7      mischaracterize.  Let me ask the question

8      instead of characterizing his testimony.

9           MR. JUDD:  I agree with that.

10          Q.     Did you personally, either in person or

11     orally, hear Sharon provide any instructions, orally,

12     to Orange County regarding the concrete pouring

13     process?

14          A.     One thing is certain, that there was a

15     plan to pour concrete.  I was not present at each and

16     every discussion.  I have no idea what letters were

17     given and what weren't.

18          Q.     I'm not asking about letters.  I'm asking

19     specifically this question:  Did you ever either hear

20     on the telephone or did you in person orally hear

21     with your ears Sharon provide any instructions to

22     Orange County regarding the concrete pouring process

23     prior to the incident?

24          A.     No.

25          Q.     Going to Rabinowitz 3, if you can look at

1          Isaac Rabinowitz

2    the two-page document.  You testified before that

3    Sharon prepared some type of plan prior to the

4    incident.  Are you talking about this plan,

5    Rabinowitz 3?

6        A.    I said I didn't request this letter.  You

7    asked me whether I understood its contents and I

8    explained.

9        Q.    What I'm asking -- you testified for two

10   days here.  Please indulge me and answer the

11   question.

12            You keep referring to that there was a

13   plan.  When you say there was a plan, are you talking

14   about the second page of Rabinowitz 3?  Is that the

15   piece of paper, the plan you're talking about?

16       A.    When I talk about the plans, it's what

17   you showed me.

18            MR. JUDD:  He is asking you specifically

19        about this second page of Exhibit Number 3.

20       Q.    Is that the plan you're talking about

21   that Sharon provided?

22            MR. JUDD:  If you know.

23            MR. POLISHOOK:  Everything is if he

24        knows.

25       A.    I say again.  The letter comes from

1                    Isaac Rabinowitz

2    Sharon.  I'm repeating again and again.  This letter

3    came from Sharon.  I did not order it.  I did not ask

4    for it.

5         Q.    I understand and I appreciate that.  What

6    I'm asking, you have testified that Sharon provided

7    some type of plan prior to the incident.  Is that

8    plan that you're talking about this, the second page

9    of Rabinowitz 3?

10              MS. NOREK-HATCH:  Or is this part of the

11         plan.  He said part of the plans.  Is it these

12         plans?

13              MR. JUDD:  Or something else.

14              MS. NOREK-HATCH:  The question is, was it

15         this part of the plan.  You keep asking is this

16         the plan.

17              MR. POLISHOOK:  I am saying "plan."  He

18         testified when he was shown Exhibit 7 that it

19         wasn't it.  I'm suspecting what this is -- let

20         me withdraw the question.  I will ask a better

21         question.

22         Q.    Besides Exhibit 3 and Exhibit 7 --

23              MR. JUDD:  Which is all of these plans

24         that you looked at earlier.

25              MR. POLISHOOK:  I'm going to withdraw the

1              Isaac Rabinowitz

2       question.  I'm going to finish my other

3       questions.  I think he answered this.  I just

4       have a few more.

5              MR. JUDD:  Off the record.

6              (Discussion held off the record.)

7       Q.     After the incident, did you ever ask

8  Orange County why they didn't use the forms that they

9  had built for the wall adjacent to 48 North First

10 Street?

11             MR. KULLER:  Objection.

12      A.     We spoke of the accident.  We discussed

13 why it occurred, and from that day to the present

14 time, we had no conversation.

15      Q.     Did you ever ask him -- withdrawn.

16             You testified the first day that you

17 didn't see forms in the area where the incident

18 occurred after the incident.  So I'm asking --

19      A.     I said even today.

20      Q.     I'm asking, did you ask Orange County why

21 you didn't find forms in the area where the incident

22 occurred after the incident?

23             MR. KULLER:  Objection.

24             MR. JUDD:  I object.  I believe at his

25      prior deposition he said that he did see a form

1       Isaac Rabinowitz

2       on the inner part of the wall.  He did not see

3       one on the exterior portion of the building.

4               MR. POLISHOOK:  Let me rephrase that.

5       Q.      After the incident, did you ask anyone

6       from Orange County why you didn't see a form on the

7       exterior of the wall adjacent to 48 North First

8       Street?

9               MR. KULLER:  Objection.

10      A.      There was no need or reason to get into

11      this conversation or argument because Orange County

12      knew that they made a mistake, that it was their

13      fault that the accident occurred, so we didn't have

14      to.

15              MR. POLISHOOK:  I don't have any further

16              questions.  I will follow up with counsel to the

17              extent any drawings, specifications and plans

18              that Mr. Rabinowitz referred to from Sharon

19              haven't been produced prior to this litigation,

20              that they be produced at a later date, if they

21              exist.  We would be entitled to an additional

22              deposition if anything else is produced.

23              Otherwise, I have no further questions.

24              Besides any followup after other counsel, I'm

25              done with my questions.  Thank you very much.

1              Isaac Rabinowitz

2         MR. JUDD: We, of course, object to

3      producing him for yet another day. We've

4      responded to your discovery demands. If you

5      have further discovery demands, please put them

6      in writing and we will take it under advisement.

7         (Luncheon recess taken from 1:15 p.m. to

8      2:00 p.m.)

9 EXAMINATION BY MR. KULLER:

10      Q.    Good afternoon, Mr. Rabinowitz. My name

11 is Brett Kuller. I'm an attorney with the law firm

12 Abrams, Garfinkel, Margolis, Bergson. We represent

13 the defendant, Orange County Superior Concrete, in

14 this case.

15      There was testimony previously regarding

16 the Styrofoam that you observed in between the wall

17 being poured at 50 North First Street and the

18 adjacent wall at 48 North First Street. Do you know

19 if anyone gave Orange County instructions to use that

20 Styrofoam?

21         MR. POLISHOOK: Objection to form.

22         MR. JUDD: I object also insofar as I

23      don't believe he specified where he -- that he

24      saw the Styrofoam in that exact location.

25         MR. KULLER: Withdrawn.

1          Isaac Rabinowitz

2     Q.     Did you see Styrofoam on the third floor

3     in the wall where the accident had taken place,

4     Mr. Rabinowitz?

5               MR. JUDD:  Object to form.

6     A.     I did, after the accident.

7     Q.     And do you know whether anyone instructed

8     Orange County to use that Styrofoam?

9               MR. POLISHOOK:  Objection to form.

10    A.     I didn't.

11    Q.     Do you know if anybody else did?

12    A.     I don't know.

13    Q.     Does HSD Construction or the Rabsky Group

14    have a file in its office that pertains to the

15    construction project at 50 North First Street?

16    A.     There were some paperwork but not a lot

17    because there was not much work done there.  There

18    wasn't a lot of work.

19    Q.     What was contained within the file?

20    A.     There was the contract between us and

21    Orange County.  There should have been the contract

22    between me and Gold.  He was one of the first.  There

23    was not much work ongoing.  I came in in the middle.

24    All the work was done by someone else.

25    Q.     Do you know who the first general

1                    Isaac Rabinowitz

2    contractor -- well, withdrawn.

3                    Do you know who the general contractor

4    was for the construction project before HSD?

5         A.    I know his name but not the company's

6    name.

7                    MR. JUDD:  I think that was asked and

8         answered at the last deposition.

9         Q.    What was the individual's name?

10        A.    Turner.

11        Q.    Would that be T-Y-R-A-N?

12        A.    I said Tyrnauer.

13        Q.    What about the company WTC Construction,

14   Inc.?

15        A.    It's possible.  I don't know.

16        Q.    Do you know who the prior owner was for

17   the construction?

18        A.    I did the agreement with the owners.  The

19   owners contracted with the first one and I came in in

20   the middle.

21                   MR. JUDD:  He asked you do you know who

22        the prior owner was.

23        A.    I don't know.

24        Q.    What was the last day that HSD served as

25   the general contractor for the construction project?

1          Isaac Rabinowitz

2          MR. JUDD:  After or before the incident?

3          MR. KULLER:  I just want to know what the

4     last day was that they were serving as the

5     general contractor for the construction project.

6          A.    We didn't work very much longer.  After

7     the accident, we didn't work at all, but it took much

8     longer for our name to get off as the contractor.

9          Q.    So HSD didn't perform any services at the

10    construction site after June 2, 2009?

11         A.    Yes.

12         Q.    And when you say it took more time for

13    your name to get off, are you talking about at the

14    Department of Buildings with respect to permits?

15         A.    From the Building Department, yes.

16         Q.    Do you know around what time that HSD was

17    removed from the permits or the records at the

18    Department of Buildings?

19         A.    I didn't do a renewal, so I -- seemingly,

20    it would have been the date when it expired.

21         Q.    Do you have a copy of the permit, the

22    original permit that HSD took out?  The question

23    is -- you've got to let me finish.

24              Does Mr. Rabinowitz have a copy of the

25    original permit that HSD took out for this

1                    Isaac Rabinowitz

2    construction project?

3          A.      You could look at it online.

4          Q.      Where online?

5          A.      Department of Buildings site.

6          Q.      Are you aware of any entity presently

7    that would have construction records checked out from

8    the Department of Buildings right now?

9               MR. JUDD:  Objection to form.  If you

10          understand that question, then you can answer

11          it.

12              THE INTERPRETER:  I cannot translate

13          that.  I didn't understand.

14          Q.      Are you aware of any entity that right

15   now has the DOB records for this construction project

16   checked out?

17              MR. JUDD:  Objection to the form.  Go

18          ahead.

19              THE INTERPRETER:  I need to hear the

20          question again.

21              (The record was read by the reporter.)

22          A.      No.

23              MR. JUDD:  If you don't understand the

24          question, please indicate that, whenever you

25          don't understand.

1          Isaac Rabinowitz

2          THE WITNESS:  Okay.

3     Q.     Regarding the job file, other than the

4    contract with Orange County and the contract with

5    Gold Development & Management, what else, if

6    anything, is contained within that file?

7     A.     I don't remember.

8          MR. JUDD:  Just object to the form.

9     Q.     Would there be applications for payment?

10    A.     Possibly.  I don't know.

11    Q.     How was HSD paid for the work that it

12   performed at the construction project?

13    A.     I didn't get any.

14    Q.     You didn't receive any money for the

15   services that HSD rendered at the construction

16   project?

17    A.     No.

18          MR. JUDD:  Objection.

19    A.     I am still waiting.

20          MR. JUDD:  That was his testimony in his

21     last deposition as well.

22    Q.     Do you know why it is that Gold

23   Development & Management has not paid HSD any money

24   for this construction project?

25    A.     Because the bank did a foreclosure and

1                Isaac Rabinowitz
2    sold the building and he found himself outside.
3        Q.    Mr. Rabinowitz, I'm just showing you what
4    was marked today as Rabinowitz 3.  With respect to
5    the second page, I would just like to ask you if you
6    requested Mr. Sharon to draft that document.
7            MR. POLISHOOK:  Objection.  Asked and
8        answered.  You can answer.
9            MR. JUDD:  Same objection.
10           MS. NOREK-HATCH:  It's not an appropriate
11       objection.  Another party can ask the same
12       questions.
13       A.    I said before that this document is
14   probably questions that he had regarding the project,
15   questions he had for Orange County.
16       Q.    The questions that who had for Orange
17   County?
18       A.    Questions that Orange County had for
19   Sharon.
20       Q.    Did Orange County request that you obtain
21   something in writing from Mr. Sharon?
22       A.    No.  He spoke directly to Sharon alone.
23       Q.    Orange County spoke directly to Sharon?
24           MR. POLISHOOK:  Objection to form.
25       A.    I can't answer that accurately because

1            Isaac Rabinowitz

2    that is to the best of my understanding.

3        Q.    You see on the first page, correct, that

4    this document was faxed from Mr. Sharon to the Rabsky

5    Group.  Correct?

6            MR. JUDD:  Object to form.  You can

7        answer.

8        A.    Yes.

9        Q.    So do you know whether anybody at the

10   Rabsky Group requested Mr. Sharon to provide them

11   with this document?

12           MR. POLISHOOK:  Object to form.

13       A.    That does not prove anything, that we

14   have anything do with it.  Sharon had this kind of

15   paper and he faxed it to us.

16       Q.    Do you know why it is that that document

17   was faxed to the Rabsky Group?

18           MR. POLISHOOK:  Objection to form.

19       A.    No.

20       Q.    Do you know if this document was provided

21   to Orange County?

22           MR. POLISHOOK:  Object to form.

23       A.    I don't know.

24       Q.    Have you ever seen that document prior to

25   today?

1                    Isaac Rabinowitz

2        A.    I heard about it before we came here for

3   the first time.

4              MR. JUDD:  Do you mean other than when he

5        was shown this on August 9th of this year?

6              MR. POLISHOOK:  I did show it to him.

7        Rephrase that.

8        Q.    Did you ever see this two-page

9   document -- actually, withdrawn.

10             Did you ever see the second page of this

11  document prior to August 9, 2012?

12             MR. POLISHOOK:  You mean Rabinowitz 3?

13       A.    No.

14       Q.    Do you know if anyone provided this

15  document to Orange County Superior Concrete?

16             MR. POLISHOOK:  Objection to form.

17       A.    No.

18       Q.    Am I correct that the only individual

19  that you ever dealt with at Orange County Superior

20  Concrete is Joel Falkowitz?

21       A.    Yes.

22       Q.    Can you just tell me what the

23  circumstances were under which you first met Joel

24  Falkowitz?

25       A.    He came to ask us to start working with

1          Isaac Rabinowitz

2   our company and this was the first building I gave

3   him and I hope it will be the last.

4          Q.    Did you meet with Joel Falkowitz at

5   50 North First Street prior to the time that Orange

6   County commenced working at the construction project?

7          A.    Yes.

8          Q.    The first time that you met with Joel

9   Falkowitz at 50 North First Street, what did you

10  discuss with him?

11         A.    About the work, what needs to be done,

12  and that's it.

13         Q.    Did you talk about any details as to how

14  Orange County would perform its work?

15         A.    No.

16         Q.    Did you give any instructions to Orange

17  County as to how Orange County should perform its

18  work?

19         A.    No.

20         Q.    Did you believe that form was going to be

21  used on the third floor, on the wall, on the adjacent

22  wall where this accident took place?

23              MR. JUDD:  Object to form.

24         A.    They were going to use foam.  He did that

25  on his own, at his own discretion.

1          Isaac Rabinowitz

2      Q.     Orange County made the decision on its

3   own to not use form on the third floor of the

4   building where the accident occurred?

5          MR. JUDD:  Object to form.

6      A.     I didn't explain to him or get into any

7   detail of how to do it.  He did that on his own

8   discretion.  That's not part of my expertise or what

9   I need to know about.

10         MR. KULLER:  Off the record.

11         (Discussion held off the record.)

12         MS. NOREK-HATCH:  Would you read the

13     answer.

14         (The record was read by the reporter.)

15     Q.     So you didn't give Orange County any

16  direction whatsoever about how to accomplish his

17  work?

18     A.     Right.

19         MR. JUDD:  Asked and answered.

20     Q.     How many times did you meet with Joel at

21  50 North First Street before Orange County commenced

22  its work?

23     A.     Two, three times.

24     Q.     What did you discuss with Joel?

25     A.     Money.

1                    Isaac Rabinowitz

2          Q.      Is there anything you discussed with

3    Joel, other than money?

4          A.      No.

5          Q.      About how long did it take Orange County

6    Superior Concrete to complete the pouring of the

7    vertical wall on the first floor at the wall adjacent

8    to 48 North First Street?

9                  MR. JUDD:  Object to form.  He can

10           answer.

11         A.      He did first the first, then the second,

12    and it took a few days.  The accident occurred on the

13    third floor.

14         Q.      How long before the accident were the

15    first and second walls completed?

16         A.      Several days.

17         Q.      After the wall -- when I'm talking about

18    the wall, I'm talking about the walls adjacent to

19    48 North First Street.  I'm speaking specifically

20    about those walls and that's it.

21         A.      I understand.

22         Q.      After the wall on the first floor was

23    complete, did you view the wall?

24         A.      Yes.

25         Q.      Were you satisfied with the work on the

1                    Isaac Rabinowitz

2    first floor?

3         A.    It looked all right, but I couldn't see

4    clearly because he immediately started working on the

5    second one, so it wasn't complete to be able to say

6    how well I liked it, but I was satisfied with what I

7    saw.  The forms were closed.

8         Q.    Did you know that there had not been a

9    form used on the first floor with respect to that

10   wall?

11             MR. POLISHOOK:  Object to form.

12             MR. JUDD:  Objection to the form.

13             MR. POLISHOOK:  Could we go off the

14        record for a second?

15             (Discussion held off the record.)

16             MR. POLISHOOK:  I might have missed

17        something.  My objection is to foundation.  I'm

18        not sure whether he testified yet to whether he

19        witnessed the form or lack thereof for the first

20        or second floor.  I might have missed it.  I

21        think foundation should be set before you ask

22        and he answers the question.  That's the ground

23        for my objection.

24        Q.    Why don't you explain to me,

25   Mr. Rabinowitz, please, what construction work you

1    Isaac Rabinowitz

2    did observe Orange County performing on the first

3    floor.

4         A.    What he needed to do was to make the wall

5    between where the accident occurred -- he needed to

6    maybe in the elevator do the walls and floors.  He

7    put concrete on the floor, one or two floors, I don't

8    remember, but in the elevator he also made one or two

9    floors.  There he opened the forms.  I saw his work.

10        Q.    I just want to know specifically what

11   work you observed on the first floor with respect to

12   the walls.

13        A.    What am I supposed to see?  I saw

14   concrete, I saw a closed wall.

15             MR. JUDD:  So before the accident, did

16        you observe the wall on the first and second

17        floor?

18             THE WITNESS:  The first one I did, but

19        the second, I'm not sure.  It was still closed

20        with wood.

21        Q.    When you say it was closed on the second

22   floor, do you mean that the form on the outside of

23   the wall was still up?

24             MR. POLISHOOK:  Object to form.

25        A.    Yes, that was covering the cement.  The

Isaac Rabinowitz

1

2  form concealed the concrete.

3          MS. NOREK-HATCH:  Could you please

4      clarify what he meant by outside, the 48 North

5      First Street side or inside of the building?

6          MR. KULLER:  Every time I'm talking about

7      walls, I'm talking about -- ^

8          MS. NOREK-HATCH:  You asked about the

9      form being on the outside of the wall.  My

10     question is, what do you mean by outside?  Are

11     you talking about the inside of the building or

12     the side of the wall that's between their

13     building and the building adjacent to it?

14         MR. KULLER:  The form that he could

15     observe by looking at the wall.

16         MS. NOREK-HATCH:  I imagine that's inside

17     the building.  You called it outside.

18     A.     The wall that you're asking about is the

19  wall that is separating our building with the

20  neighbor's building?

21     Q.     Yes.  And I just wanted to know what you,

22  Mr. Rabinowitz, observed.

23     A.     Whatever I said.  Some was concealed by

24  form.

25     Q.     Was anyone on behalf of HSD inspecting

1              Isaac Rabinowitz

2    Orange County's work?

3              MR. POLISHOOK:  Object to form.

4              MR. JUDD:  Object also.

5         A.    Before the pouring of the concrete?

6         Q.    At any time that Orange County performed

7    work.

8              MR. JUDD:  Prior to the accident?

9              MR. KULLER:  Of course, prior to the

10        accident.

11        A.    No.

12        Q.     The answer is no?

13        A.     The answer is no.

14        Q.    What is your understanding of what a

15   controlled inspection is?

16        A.    Where somebody comes to inspect.

17        Q.    And is it your understanding that a

18   controlled inspector would be a professional,

19   meaning, an architect or engineer?

20        A.    Yes.

21        Q.    Is it also your understanding that with

22   respect to this construction project, there should

23   have been controlled inspections taking place?

24              MR. POLISHOOK:  Objection.  Calls for

25        legal conclusion.

1              Isaac Rabinowitz

2        Q.    Yes or no?

3        A.    It's not binding.  It's not an

4   obligation.

5        Q.    Is it your understanding that in June of

6   2009, at this construction project, there was no

7   requirement that there be a controlled inspector on

8   record?

9              MR. POLISHOOK:  Object to form.

10             MR. JUDD:  Objection to form.

11             MR. POLISHOOK:  We need to know

12        everything that's said.  He can't explain

13        something to you that's not translated.  I

14        understand you're trying to help.  Everything he

15        says you have to translate.

16             THE INTERPRETER:  You have to give me a

17        chance.

18             MR. POLISHOOK:  Repeat the question.

19             (The record was read by the reporter.)

20             THE INTERPRETER:  I can translate the

21        first part of the answer.  Now he is telling me

22        to say -- I don't know.  He said something

23        before.  This specific question that you asked,

24        I don't know, but what he said before was that

25        in building, in construction of buildings, the

1                   Isaac Rabinowitz

2      several obligations are dependent upon which way

3      the building is going to be built.

4      Q.     With respect to this specific

5 construction project, is it your understanding that

6 in June of 2009 there had to be a controlled

7 inspector on record?

8              MR. POLISHOOK: Objection. Calls for

9      legal conclusion, regardless.

10             MR. JUDD: Same objection.

11      Q.     You can answer.

12             MR. JUDD: If you can.

13      A.     I don't know.

14      Q.     Do you have any understanding with

15 respect to the pouring of concrete walls at the

16 construction project when, if at all, a controlled

17 inspection should have taken place?

18             MR. JUDD: I need to hear that again.

19             (The record was read by the reporter.)

20             MR. JUDD: Object to the form.

21      A.     I don't know.

22      Q.     Do you have any understanding as to

23 whether there should have been any inspection of the

24 pouring of the concrete walls at 50 North First

25 Street?

1          Isaac Rabinowitz

2          MR. POLISHOOK:  Objection.

3          MR. JUDD:  Objection to form.

4     Q.     Any type of inspection.

5     A.     About what?  The concrete, other things?

6          MR. JUDD:  He said anything.

7     Q.     Just about the concrete walls, pouring of

8  the concrete walls.

9     A.     I don't remember.  That's the problem.  I

10  don't remember.

11     Q.     I'm just asking whether or not there

12  should have been any inspection of the pouring of the

13  concrete walls.

14          MR. POLISHOOK:  I am just going to object

15     to form.

16          MR. JUDD:  I object as well.  It does

17     call for a legal conclusion.

18     A.     Nobody came to check or inspect how to

19  pour the cement, but they inspected the rebar to see

20  if the steel rebar is the same as the plan shows.

21     Q.     Who made that inspection?

22     A.     I don't remember.

23          MR. JUDD:  He said somebody came and

24     inspected the rebar.

25          MR. KULLER:  Read that back.